IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

No. 22-2183

THE BAIL PROJECT, INC.,

Plaintiff/Appellant,

v.

COMMISSIONER, INDIANA DEPARTMENT OF INSURANCE, *in her official capacity,*

Defendant/Appellee.

_____

On Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:22-cv-862-JPH-MJD
The Honorable James P. Hanlon, Judge

**BRIEF AND SHORT APPENDIX OF APPELLANT**
_____

Kenneth J. Falk
*Counsel of Record*
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105

Attorneys for Appellant

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2183

Short Caption: The Bail Project, Inc. v. Commissioner, Indiana Department of Insurance

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Bail Project, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Kenneth J. Falk    Date: July 8, 2022

Attorney's Printed Name: Kenneth J. Falk

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑  **No** ☐

Address: ACLU of Indiana, 1031 E. Washington St., Indianapolis, IN 46202

Phone Number: 317/635-4059    Fax Number: 317/635-4105

E-Mail Address: kfalk@aclu-in.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2183

Short Caption: The Bail Project, Inc. v. Commissioner, Indiana Department of Insurance

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Bail Project, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

ACLU of Indiana

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Gavin M. Rose    Date: July 8, 2022

Attorney's Printed Name: Gavin M. Rose

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 1031 E. Washington St.

Indianapolis, IN 46202

Phone Number: 317-635-4059    Fax Number: 317-635-4105

E-Mail Address: grose@aclu-in.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2183

Short Caption: The Bail Project, Inc. v. Commissioner, Indiana Department of Insurance

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Bail Project, Inc.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    ACLU of Indiana

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ Stevie J. Pactor     Date: July 15, 2022

Attorney's Printed Name: Stevie J. Pactor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address: ACLU of Indiana, 1031 E. Washington St. Indianapolis, IN 46202

Phone Number: 317-635-4059     Fax Number: 317-635-4105

E-Mail Address: spactor@aclu-in.org

# TABLE OF CONTENTS

Table of Authorities ................................................................................ iii

Jurisdictional Statement ........................................................................ 1

Statement of the Issues ......................................................................... 1

Statement of the Case ........................................................................... 3

    I.     The payment of bail in Indiana ........................................ 3

    II.    HEA 1300.......................................................................... 6

    III.   The Bail Project .............................................................. 9

    IV.   The Bail Project in Indiana........................................... 11

    V.    The effect of HEA 1300 on The Bail Project's Advocacy in Indiana against cash bail.................................................... 14

    VI.   Procedural history ......................................................... 15

Summary of the Argument.................................................................... 17

Standard of Review................................................................................ 22

Argument ............................................................................................... 22

    I.     The payment of bail by The Bail Project is expressive conduct protected by the First Amendment.................................... 23

    II.    The district court erred in concluding that The Bail Project was not likely to succeed in its claims that HEA 1300 violates the First Amendment because it is unconstitutionally vague and because it is unconstitutionally impinges on the Bail Project's expressive conduct ........................................................................... 30

          A.    HEA 1300 is unconstitutional because it vests in the Commissioner standardless discretion as to the licensing of charitable bail organizations................................. 30

          B.    HEA 1300 violates the First Amendment in that it targets only charitable bail organizations such as The Bail Project and no other entities engaged in similar expressive conduct, and

it limits for whom The Bail Project can engage in its expressive conduct of paying bail ........................................................... 33

    1.    HEA 1300 is content based and does not survive strict scrutiny ........................................................................ 33

    2.    HEA 1300 also fails the intermediate scrutiny demanded by *O'Brien* .................................................................... 37

III.    The district court erred in concluding that HEA 1300 did not violate The Bail Project's equal protection rights ...................................... 41

IV.    The other requirements for the grant of a preliminary injunction are met here .................................................................................... 45

    A.    The Bail Project is facing irreparable harm for which there is no adequate remedy at law .................................................. 45

    B.    The balance of harms favors The Bail Project ...................... 46

    C.    The public interest will not be disserved by the grant of a preliminary injunction ........................................................... 46

    D.    The preliminary injunction should be granted without bond ................................................................................... 47

Conclusion ........................................................................................ 47

Certificate of Compliance ................................................................ 48

Certificate of Service........................................................................ 49

Short Appendix ......................................................................... S.A. 1

    Order Denying Motion for Preliminary Injunction (entered June 29, 2022 as District Court Docket No. 36) .......................................... S.A. 1

    Statement of Compliance with Circuit Rule 30(d)................................ S.A. 21

# TABLE OF AUTHORITIES

**Cases:**

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992)................. 22

*Bonte v. U.S. Bank, N.A.*, 624 F.3d 461 (7th Cir. 2010)............................................. 45

*Brandt v. Board of Educ. of Chicago*, 480 F.3d 460 (7th Cir. 2007) .......................... 30

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ......................... 22, 36

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021)................................. 25

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006)................................. 46

*Church of the American Knights of the Ku Klux Klan v. City of Gary, Indiana*, 334
   F.3d 676 (7th Cir. 2003) .................................................................................... 19, 32

*Citizens United v. FEC*, 558 U.S. 310 (2010)......................................................... 20, 34

*City of Austin, Texas v. Reagan National Advertising of Austin, LLC*, –U.S.–, 142 S.
   Ct. 1464 (2022) ................................................................................................... 33, 35

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................................. 42

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) .............................. 32

*Clancy v. Office of Foreign Assets Control*, 559 F.3d 595 (7th Cir. 2009)................. 29

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) .......... 17, 23, 24

*Cornelio v. Conn.*, 32 F.4th 160 (2nd Cir. 2022) ....................................................... 38

*Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018)........................... 22

*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015) ................................. 18, 25, 26

*DeWees v. State*, 180 N.E.3d 261 (Ind. 2022) ......................................................... 5, 41

*Edenfield v. Fane*, 507 U.S. 761 (1993)..................................................................... 38

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................ 45

*Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718 (S. D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016)............................................................................ 45

*Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301 (11th Cir. 2003) ............... 17, 23

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018) ........................................................................................................ 28

*Foxxxy Ladyz Adult World, Inc. v. Village of Dix, Ill.*, 779 F.3d 706 (7th Cir. 2015) 37

*Freedman v. Maryland*, 380 U.S. 51 (1965) ................................................................ 32

*Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453 (7th Cir. 2010) ..................... 47

*Hobbs v. Lindsay*, 162 N.E.2d 85 (Ind. 1959) .............................................................. 3

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................... 35

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ................. 24

*Hope v. Comm'r of Indiana Dep't of Correction,* 9 F.4th 513 (7th Cir. 2021) ........... 42

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) .............................................................................................. 17, 19, 24, 27

*Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613 (7th Cir. 2004)................. 46

*Minnesota Voters Alliance v. Mansky*, –U.S.–, 138 S. Ct. 1876 (2018)..................... 32

*NetChoice, LLC v. Attorney General, Florida,* 34 F.4th 1196 (11th Cir. 2022) ......... 26

*O'Laughlin v. Barton*, 549 N.E.2d 1040 (Ind. 1990)............................................ 5, 39

*Plyler v. Doe*, 457 U.S. 202 (1982) ............................................................................ 42

*Porter v. Gore*, 517 F. Supp. 3d 1109 (S.D. Cal. 2021), *appeal pending*, No. 21-55149 (9th Cir.) ........................................................................................................... 27

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) .............................. 20, 23, 33, 34

*Romer v. Evans*, 517 U.S. 620 (1996)........................................................................ 42

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006).. 28

*Spence v. Washington*, 418 U.S. 405 (1974) ............................................ 18, 24, 25, 29

*Surita v. Hyde*, 665 F.3d 860, 870 (7th Cir. 2011) ...................................... 35

*Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017) ........................... 29

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................... 17, 22, 23

*Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015) .......................... 22

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ....................... 5, 38

*Turner v. Clary*, 606 N.E.2d 878 (Ind. Ct. App. 1993) ............................... 5

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) .................... 42

*United States v. O'Brien*, 391 U.S. 367 (1968) .................................... *passim*

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) .............. 36

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................... 38

*Vision Church v. Village of Long Grove*, 468 F.3d 975 (7th Cir. 2006) ............... 21, 42

## Constitutional Provisions:

Ind. Const. Art. 1 § 16 ............................................................... 4

Ind. Const. Art. 1 § 17 ............................................................... 4

## Statutes:

### United States

28 U.S.C. § 1292(a)(1) ............................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

### Indiana

HEA 1300 ...................................................................... *passim*

Indiana Code 1-1-2-4(b)(3) ................................................................ 7

Indiana Code § 26-2-8-102(3) ......................................................... 34

Indiana Code § 27-10-2-3.5(a)(2) .................................................. 6

Indiana Code § 27-10-2-4.1 ............................................................. 6

Indiana Code § 27-10-2-4.5 ................................................... *passim*

Indiana Code § 27-10-2-4.5(a)(1) ............................................ 6, 34

Indiana Code § 27-10-2-4.5 (a)(2) ................................................ 6

Indiana Code § 27-10-2-4.5(b) ...................................................... 6

Indiana Code § 27-10-2-4.5(c) ...................................................... 7

Indiana Code § 27-10-2-4.5(f) ................................................. 7, 31

Indiana Code § 27-10-2-4.5(f)(7) ............................................ 8, 32

Indiana Code § 27-10-2-4.5(g)(2) ................................................ 6

Indiana Code § 27-10-2-4.5(g)(3) ................................................ 8

Indiana Code § 27-10-2-4.5(i) ....................................................... 8

Indiana Code § 27-10-3-1 .............................................................. 5

Indiana Code § 35-33-8-3.2(a) ................................................... 12

Indiana Code § 35-33-8-4(b) ..................................................... 3, 4

Indiana Code § 35-33-8-4(b)(8) ................................ 19, 28, 40, 44

Indiana Code § 35-33-8-7 .............................................................. 5

Indiana Code § 35-50-1-2(a) ......................................................... 6

**Rules:**

Federal Rule of Civil Procedure 65(c) ...................................... 47

Indiana Rule of Criminal Procedure 26 ......................................................... 4

**Regulations:**

26 C.F.R. § 301.7701-2 ................................................................................ 34

Emergency Rule, Title 760 Department of Insurance, LSA Document #22-225(E), posted June 29, 2022, available at http://iac.iga.in.gov/iac//irdin.pdf?din ..... 7, 8, 13

**Other authorities:**

3 Ind. Law Encyc., *Arrest Bail, and Recognizance* ....................................... 3

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction of this case pursuant to 28 U.S.C. § 1331. Federal question jurisdiction was based on alleged violations by the defendant of both the First and Fourteenth Amendments to the United States Constitution.

The Bail Project is a nonprofit corporation incorporated in New York with its principal office in California. It is registered in Indiana as a foreign nonprofit corporation.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1292(a)(1) as it is an appeal from the district court's denial of plaintiff's motion for a preliminary injunction. The denial occurred on June 29, 2022, and the merits of plaintiff's case remain to be resolved by the district court. The Notice of Appeal was filed on July 6, 2022. This is not an appeal from a decision of a magistrate judge.

## STATEMENT OF THE ISSUES

Prior to July 1, 2022, the effective date of House Enrolled Act 1300 ("HEA 1300"), any person or organization—including a perfect stranger—could pay cash bail for a criminal defendant once an Indiana trial court set cash bail for that individual. Following the enactment of the statute, any person or entity may still pay the cash bail, with the exception of entities that fall within the newly created category of "charitable bail organizations." The only such organization operating in Indiana prior to July 1, 2022 was The Bail Project. Under the new statute, The Bail Project cannot function at all unless it is licensed by the Commissioner of the

Indiana Department of Insurance ("Commissioner") pursuant to vague and uncertain standards. And, once The Bail Project is licensed, the statute prohibits it from paying cash bail for certain defendants based on their current charges or past convictions, even though an Indiana court has established cash bail for them and even though every other human being and entity in Indiana or elsewhere may pay the bail. This is particularly onerous for The Bail Project as its sole and well-known organizational purpose is to advocate for an end to cash bail by paying bail for individuals and then assisting in ensuring that they appear for court appearances, thus demonstrating that cash bail is not necessary.

The questions presented for review are:

1. Whether the district court erred in holding that The Bail Project's protest and advocacy efforts against cash bail through the payment of bail are not protected as expressive conduct under the First Amendment.

2. Whether, given that the payment of bail by The Bail Project is expressive conduct, The Bail Project is likely to succeed on its claim that:

   a. the unfettered discretion given to the Commissioner by HEA 1300 to determine whether or not to license charitable bail organizations and to maintain those licenses violates the First Amendment.

   b. HEA 1300, by specifically targeting particular speakers and particular speech, fails not only the requisite strict scrutiny demanded by the First Amendment but even the intermediate scrutiny applied in *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968).

3.     Whether, regardless of The Bail Project's First Amendment rights, the district court erred in holding that HEA 1300 does not violate The Bail Project's equal protection rights inasmuch as once a state court determines that cash bail can be paid to release a defendant from jail pending trial, after taking into account "all facts relevant to the risk of nonappearance," Ind. Code § 35-33-8-4(b), all individuals and organizations in Indiana and the rest of the world can pay that bail, regardless of the defendant's current charges or past convictions, except for charitable bail organizations.

4.     Whether the remaining requirements for the grant of a preliminary injunction are met so that one should be issued in favor of The Bail Project.

## STATEMENT OF THE CASE

I.     The payment of bail in Indiana

"Bail in criminal proceedings is defined as security necessary to release a person from custody and to assure his or her appearance before the proper court whenever required." 3 Ind. Law Encyc., *Arrest Bail, and Recognizance* § 19 (footnote omitted). "The object of bail prior to trial is to insure the presence of the accused when required without the hardship of incarceration before guilt has been proved and while the presumption of innocence is to be given effect." *Hobbs v. Lindsay*, 162 N.E.2d 85, 88 (Ind. 1959) (internal quotation and citations omitted). The Indiana Constitution provides that "[e]xcessive bail shall not be required" and states that "[o]ffenses other than murder or treason, shall be bailable by sufficient sureties."

Ind. Const. Art. 1 §§ 16, 17.[1] However, the Indiana Supreme Court has made it clear

---

[1]      Indiana Code § 35-33-8-4(b) provides that "[b]ail may not be set higher than that amount reasonably required to assure the defendant's appearance in court or to assure the physical safety of another person or the community if the court finds by clear and convincing evidence that the defendant poses a risk to the physical safety of another person or the community." The statute then provides that the judge "shall," among other things:

> take into account all facts relevant to the risk of nonappearance, including:
>
> (1) the length and character of the defendant's residence in the community;
> (2) the defendant's employment status and history and the defendant's ability to give bail;
> (3) the defendant's family ties and relationships;
> (4) the defendant's character, reputation, habits, and mental condition;
> (5) the defendant's criminal or juvenile record, insofar as it demonstrates instability and a disdain for the court's authority to bring the defendant to trial;
> (6) the defendant's previous record in not responding to court appearances when required or with respect to flight to avoid criminal prosecution;
> (7) the nature and gravity of the offense and the potential penalty faced, insofar as these factors are relevant to the risk of nonappearance;
> (8) the source of funds or property to be used to post bail or to pay a premium, insofar as it affects the risk of nonappearance;
> (9) that the defendant is a foreign national who is unlawfully present in the United States under federal immigration law; and
> (10) any other factors, including any evidence of instability and a disdain for authority, which might indicate that the defendant might not recognize and adhere to the authority of the court to bring the defendant to trial.

*Id.*

And Indiana Rule of Criminal Procedure 26 sets further factors for a criminal court to consider in setting bail:

> (A)      If an arrestee does not present a substantial risk of flight or danger to themselves or others, the court should release the arrestee without money bail or surety subject to such restrictions and conditions as determined by the court except when:
>
> (1)      The arrestee is charged with murder or treason.
> (2)      The arrestee is on pre-trial release not related to the incident that is the basis for the present arrest.
> (3)      The arrestee is on probation, parole or other community supervision.
>
> *            *            *
>
> (C)      If the Court determines that an arrestee is to be held subject to money bail, the court is authorized to determine the amount of such bail and

that the criminal court has broad discretion as to bail and release conditions. *See, e.g., DeWees v. State*, 180 N.E.3d 261, 265 (Ind. 2022).

In Indiana, bail may take the form of cash bail, where such amount as required by the court must be paid as a cash deposit, or a surety bond, where a bail bond agent will charge a percentage of the bail amount, usually 10%, and when that non-refundable amount is paid to the agent, the agent will present proof of an insurance policy for the entire bond amount. (Embree Deposition ["Embree"], District Court Docket No. ["Dkt."] 25-1 at 11:16 -12:25). The cash, if cash is paid, or the insurance policy, if a surety bond is paid, is presented to the clerk of the county where the criminal case is pending. (*Id.* at 12:7-15; 18:1-12).

Generally, only licensed bail agents may post bonds. (*Id.* at 15:13-25; *see also* Ind. Code § 27-10-3-1). However, prior to the effective date of HEA 1300 anyone could post cash bail once the criminal court granted bail and set the amount. (Embree, Dkt. 25-1 at 9:20-22; 18:1-12).

If the defendant appears at all court proceedings, the cash bail will be released at the conclusion of the case. *See, e.g., Turner v. Clary*, 606 N.E.2d 878, 880 (Ind. Ct. App. 1993). But if the defendant fails to appear as required, the entirety of the cash bail or the value of the surety bond may be forfeited. Ind. Code § 35-33-8-7; *O'Laughlin v. Barton*, 549 N.E.2d 1040, 1042 (Ind. 1990).

---

whether such bail may be satisfied by surety bond and/or cash deposit.

## II.    HEA 1300

HEA 1300, which in relevant part went into effect on July 1, 2022, requires the Commissioner to license and regulate the newly created category of "charitable bail organizations." Ind. Code § 27-10-2-4.1. A "charitable bail organization" is a business entity or nonprofit organization that exists for the purpose of paying cash bail for third parties and does so for more than three defendants in any 180-day period, although persons who pay bail for close relatives are exempted from the definition. Ind. Code § 27-10-2-4.5(a)(1).

The Commissioner may certify a charitable bail organization if that organization, among other things, is a business entity or nonprofit organization under the Internal Revenue Code or Indiana law, is registered to do business in Indiana, is in Indiana, and exists for the purpose of depositing cash bail for indigent criminal defendants who are not charged with a crime of violence or, if charged with a felony, have never been convicted of a crime of violence. Ind. Code § 27-10-2-4.5(b). Once certified, a charitable bail organization is not allowed to pay bail for a defendant who is charged with a crime of violence or, if charged with a felony, has ever been convicted of a crime of violence. Ind. Code § 27-10-2-4.5(g)(2). HEA 1300 provides that a "crime of violence" has the meaning set out in Indiana Code § 35-50-1-2(a). Ind. Code § 27-10-2-3.5(a)(2).[2] Indiana law also provides that "a reference to

---

[2]    Indiana Code § 35-50-1-2(a) defines a "crime of violence" as murder; attempted murder; voluntary manslaughter; involuntary manslaughter; reckless homicide; battery or domestic battery as a Level 2-5 felony; aggravated battery; kidnapping; rape; criminal deviate conduct; child molesting; sexual misconduct with a minor as a Level 1 or 2 felony; robbery as a Level 2 or 3 felony; burglary as a Level 1-4 felony; operating a vehicle while intoxicated causing death, catastrophic injury, or serious bodily injury to another person;

a conviction for an Indiana criminal offense appearing within the Indiana Code also includes a conviction for. . . [a] substantially similar offense committed in another jurisdiction." Ind. Code § 1-1-2-4(b)(3). This means that a charitable bail organization cannot provide bail for a person facing a felony who was convicted in another state of an offense that is "substantially similar" to a crime that would be a "crime of violence" in Indiana. (Dkt. 29 at 19 n.2).

A charitable bail organization must apply for certification from the Commissioner in accordance with rules that are to be promulgated. Ind. Code § 27-10-2-4.5(c). At the time of the preliminary injunction briefing no rules had been promulgated, although emergency rules were posted on June 29, 2022, the day that the district court issued its preliminary injunction determination. (Embree, Dkt. 25-1 at 21:1-14; Emergency Rule, Title 760 Department of Insurance, LSA Document #22-225(E), posted June 29, 2022, available at http://iac.iga.in.gov/iac//irdin.pdf?din =20220629-IR-760220225ERA (last visited Aug. 5, 2022) ["Emergency Rule"]).

Indiana Code § 27-10-2-4.5(f) provides that

the commissioner shall deny, suspend, revoke, or refuse to renew certification for any of the following causes:

        *              *             *

(7)    When, in the judgment of the commissioner, the certificate holder has, in the conduct of affairs under the certification, demonstrated:

        (A)    incompetency or untrustworthiness;
        (B)    conduct or practices rendering the certificate

---

child exploitation as a Level 4 or 5 felony; resisting law enforcement as a felony; unlawful possession of a firearm by a serious violent felon; and strangulation as a Level 5 felony.

> holder unfit to carry on charitable bail activities or making the certificate holder's continuance detrimental to the public interest; or
>
> (C)    that the certificate holder is no longer in good faith carrying on as a charitable bail organization;
>
> and for these reasons is found by the commissioner to be a source of detriment, injury, or loss to the public.

The terms "incompetency," "untrustworthiness," and "conduct or practices rendering the certificate holder unfit" are not defined. (Embree, Dkt. 25-1 at 34:20 - 35:9). All is dependent on the "judgment" of the Commissioner. Ind. Code § 27-10-2-4.5(f)(7) (*see also* Embree, Dkt. 25-1 at 26:9-14). The Emergency Rules do not address these terms or their meanings. (Emergency Rule). Once certified, a charitable bail organization may pay cash bail and may not execute a surety bond for a defendant. Ind. Code § 27-10-2-4.5(g)(3), (i).

The Department of Insurance was not involved in the creation of HEA 1300 or consulted in any way and is not aware of:

- why the statute imposes regulations on charitable bail organizations that are not imposed on other entities or persons who pay cash bail or post bail bonds;

- why only charitable bail organizations are prohibited from paying bail for persons charged with "crimes of violence" or charged with felonies with a past conviction for a "crime of violence;"

- any facts to support the restrictions imposed on charitable bail organizations by HEA 1300.

(Embree Dkt. 25-1 at 27:12 - 32:8). These questions can only be answered by the General Assembly. (*Id.* at 28:7-16; 31:10-13; 32:6-9).

III.     The Bail Project

The Bail Project is a nonprofit corporation that was established in 2016 and is committed to advocating for the end of cash bail and the system of conditioning a person's pretrial release from confinement on the payment of money. (Gaspar Declaration ["Gaspar"], Dkt. 25-2 ¶¶ 3-4). The Bail Project contends that cash bail results in low-income and indigent defendants needlessly having to remain incarcerated during the pendency of their criminal cases because of their inability to pay the funds necessary to secure their release. (*Id.* ¶ 5). This has a corrosive effect as it will often be impossible for an indigent defendant to pay even a small bail amount, either through a bail bond agent or through cash on their own, and will result in the indigent defendant needlessly remaining in jail pending the resolution of their case, while they still retain the presumption of innocence. (*Id.* ¶ 6). This results in significant and potentially permanent disruption of the defendants' lives and those of their families and further prolongs the cycle of poverty that entraps persons. (*Id.* ¶ 7).

The Bail Project pays cash bail for its clients. (*Id.* ¶ 8). It does this not only to protect the person, their family, and society in general from the disruptive effects of continued pretrial detention occasioned by the inability to pay bail, but also to demonstrate with each payment that requiring a criminal defendant to pay bail is not necessary to ensure court appearances. (*Id.* ¶ 9). The Bail Project pays the bail out of its National Revolving Bail Fund, which is a sum of money maintained by The Bail Project to pay cash bail for its clients around the country. (*Id.* ¶ 10). When

a client of The Bail Project has made all of their court appearances and the criminal case is resolved, the refunded bail money is put back into The Bail Project's National Revolving Bail Fund to help additional clients. (*Id.* ¶ 11). As a result, the same money can be used over and over to pay bail for persons around the country. (*Id.* ¶ 12).

The Bail Project staff will conduct an individualized needs assessment to determine a person's eligibility for its program and to create an individualized post-release support plan. (*Id.* ¶ 13). The Bail Project then posts bail at no cost to the individual, removing the financial burden that cash bail creates. (*Id.* ¶ 14). Upon their release, The Bail Project staff provide clients with reminders about court dates, transportation assistance, and voluntary referrals to social services and community resources based on the person's identified needs. (*Id.* ¶ 15). The Bail Project terms this "Community Release with Support." (*Id.* ¶ 16).[3]

In assessing whether to represent a potential client, The Bail Project considers a variety of factors in addition to the person's specific charges because people held on bail are presumed innocent by law and have been deemed to be eligible for pretrial release, contingent on the payment of bail, by a judge. (*Id.* ¶ 21). Indeed, it is the presumption of innocence for all defendants, regardless of their charges, which motivates The Bail Project's advocacy. (*Id.* ¶ 22).

At the current time The Bail Project is operating in 30 jurisdictions in 20

---

[3]    This contrasts with bail agents who do not provide any support services to their clients other than to inform the clerk that an insurance policy has been secured and that the person can be released. (Embree at Dkt. 25-1 at 13:24 -14:7). The bail agent may have no contact whatsoever with their client. (*Id.* at 13:20-23).

states. (*Id.* ¶ 17). It has provided free bail assistance to over 22,000 low-income persons. (*Id.* ¶ 18). Nationwide, as of December 2021, The Bail Project has supported clients' return to 72,291 court dates, with a 92% appearance rate. (*Id.* ¶ 19). This has therefore resulted in the overwhelming amount of bail monies being returned to The Bail Project at the end of each case, allowing The Bail Project to support additional clients. (*Id.* ¶ 20).

It is The Bail Project's ultimate goal to eliminate the need for its existence by demonstrating through its expressive advocacy of paying cash bail that bail is not necessary to ensure that persons appear for their court appearances. (*Id.* ¶ 24). The Bail Project views this form of advocacy as far more persuasive than a rally, a social media post, a rented billboard, or a contribution to a political candidate, as with each successful client, The Bail Project demonstrates that cash bail is not necessary. (*Id.* ¶¶ 25, 27). It hopes that its advocacy will be the catalyst for long-term systemic reform that will eliminate cash bail. (*Id.* ¶ 26). Paying cash bail is its essential expressive activity, and it proclaims this message in many ways, including on its website where it states "we believe that ending cash bail is one of the defining civil rights and racial justice issues of our day. Through our efforts, we seek to eliminate cash bail and ultimately put ourselves out of business." (*Id.* ¶¶ 28-29).

IV.    The Bail Project in Indiana

The Bail Project began operations in Indiana in Marion County in 2018 and in Lake County in 2020. (*Id.* ¶¶ 30-31). The Bail Project has assisted approximately 1,000 pretrial defendants in the two counties. (*Id.*). From December of 2018 through

December of 2021, The Bail Project provided cash bail and supportive services to more than 900 persons in Marion County. (*Id*. ¶ 35). The overall appearance rate for the Marion County clients was 95% and for the Lake County clients was 92%. (*Id*. ¶ 37). Of The Bail Project's Marion County clients who were convicted, only 15% were sentenced to additional time in custody beyond what they served before their release on bail. (*Id*. ¶ 38).

At the beginning of their operations in the two Indiana counties, the judges in those counties acknowledged the work of The Bail Project, noting that its efforts in assisting its clients "could complement the efforts already underway by the Court to enact the requirements of Criminal Rule 26." (Dkt. 28-6 at 1 [Marion County]; Dkt. 28-8 at 1 [Lake County]; *see also* note 1, *supra*). The judges decreed that the bail amounts paid by The Bail Project would be exempted from costs that could be imposed on other cash bond payments, directed that The Bail Project work with the county clerks to ensure prompt return of their cash bonds, and requested that The Bail Project filed periodic reports to the courts. (Dkt. 28-6 at 1 [Marion County]; Dkt. 28-8 at 1 [Lake County]; *see* Ind. Code § 35-33-8-3.2(a)).[4] The Bail Project filed reports as to its bail-payment activities. (Dkt. 28-6 at 1 [Marion County]; Dkt. 28-8 at 1 [Lake County]; Dkt. 28-9 [Lake County quarterly report]; Dkt. 28-9 [Marion County quarterly report]). The Bail Project has also supplied further information to the judges as requested. (Dkt. 28-5 [March 2022 Judiciary Report for Marion County]).

---

[4] The payment of cash amounts for bail is also referred to as a "cash bond." (Embree, Dkt. 25-1 at 12:4-6; 16:4-8).

The clerks' offices where bail is paid and the judges who set bail are aware when The Bail Project pays bail that it is the payor. (*See, e.g.,* Dkt. 28-12 at 1, 2 [Marion County bail receipts noting that the payor is The Bail Project]; Dkt. 28-12 at 11 [docket sheet of Marion County case showing that cash bond was entered in the Clerk's office on April 8, 2022, and further noting "THE BAIL PROJECT BOND PAPERWORK on that date]; Dkt. 28-12 at 29 [docket sheet of Lake County case showing that cash bond was entered on April 22, 2022 and further showing that "THE BAIL POJECT POSTED BOND"]). The Bail Project's behavior has thus been consistent with the requirement of the June 29, 2022, Emergency Rule, even before its posting, which requires that "[e]very charitable bail organization shall conduct the organization's business in such a manner that the public and those dealing with the organization shall be aware of the capacity in which the organization is acting." (Section 3, Emergency Rule, Title 760 Department of Insurance, LSA Document # 22-225(E), posted June 29, 2022, available at http://iac.iga.in.gov/iac//irdin.pdf?din =20220629-IR-760220225ERA (last visited Aug. 5, 2022).

The Bail Project has assisted, and wishes to continue to assist, persons in Indiana who have been charged with "crimes of violence" as defined in Indiana Code § 35-50-1-2(a) and who have been charged with a felony and have prior convictions for a "crime of violence." (Gaspar, Dkt. 25-2 ¶ 39). Additionally, throughout the country The Bail Project pays bail for persons who have prior convictions for offenses that, if they had been committed in Indiana, would meet the statutory definition of "crime of violence." (*Id*. ¶ 23).

V. The effect of HEA 1300 on The Bail Project's advocacy efforts in Indiana against cash bail

The Bail Project is the only potential charitable bail organization of which the Commissioner is aware. (Embree, Dkt. 25-1 at 19:23 - 20:25). Prior to July 1, 2022, The Bail Project, like any other person or entity inside or outside Indiana, was free to pay cash bail for anyone for whom bail had been set by a state court. (*Id.* at 26:19 - 27:11). The Bail Project desires to continue to pay bail for defendants who have been granted bail and who are charged with crimes of violence or who are charged with felonies and have past convictions for crimes of violence, provided that those persons satisfy The Bail Project's criteria and needs assessments. (Gaspar, Dkt. 25-2 ¶ 44). However, now that HEA 1300 is in effect The Bail Project will have to be certified as a charitable bail organization and must be subject to the restrictions in HEA 1300 in order to continue its advocacy efforts against cash bail by paying that bail. (*Id.* ¶ 40).

The restrictions in HEA 1300 on the persons for whom a charitable bail organization can pay bail will have a profound effect on the number of clients who The Bail Project can serve. The Bail Project estimates that denying it the ability to serve clients who are charged with crimes of violence or who are charged with felonies and have past convictions for a crime of violence in Indiana or elsewhere will reduce the number of clients it can serve by at least 46%. (*Id.* ¶ 45). This is not some abstract percentage; it is particularly important for The Bail Project to be able to pay bail for these defendants as it is essential that the organization advocate for

the end of cash bail for all persons, even those charged with serious crimes or those who have been convicted of such crimes in the past. (*Id.* ¶ 46). Indeed, The Bail Project believes it is especially important to pay bail, as appropriate, for persons charged with serious offenses, or who were convicted of serious offenses in the past, as this most effectively demonstrates the fallacy of requiring the payment of cash bail. (*Id.* ¶ 47). After all, if the presumption of innocence is to mean anything, one's current charge should generally not affect the pre-trial release and bail considerations, and past convictions certainly should not. (*Id.*).

Therefore, being categorically excluded from paying bail for categories of persons who have been granted bail by their criminal court will subvert The Bail Project's essential advocacy efforts. (*Id.* ¶ 50). The Bail Project will be prevented from demonstrating that regardless of the alleged crime, once a state court determines that persons may be properly and safely released pending trial, this release should occur without imposing cash bail. (*Id.* ¶¶ 48, 51).

## VI.    Procedural history

The Bail Project filed its Complaint for Injunctive and Declaratory Relief / Notice of Challenge to Constitutionality of Indiana Statute on May 4, 2022 (Dkt. 1), alleging that HEA 1300 violated both the First and the Fourteenth Amendments to the United States Constitution. (*Id.* at 14-15). On the same date, The Bail Project filed its preliminary injunction motion. (Dkt. 6).

Neither party requested a hearing on the injunction motion (Dkt. 16), and the district court entered its decision on June 29, 2022, denying the preliminary

injunction request based on the written submissions of the parties. (Order Denying Motion for Preliminary Injunction ["Order"], Short Appendix ["S.A."] at 2 n.1).

The district court concluded that The Bail Project's payment of cash bail is not expressive conduct that is protected by the First Amendment (*Id.* at 10-13). It further concluded that even if the conduct were sufficiently communicative to merit any protection under the First Amendment, Indiana has a sufficient interest to satisfy the intermediate level of scrutiny demanded by *O'Brien.* (*Id.* at 13-15). The district court therefore held that The Bail Project had not shown the required likelihood of success on its First Amendment argument. (*Id.* at 15).

The district court also held that under the low-level scrutiny demanded by equal protection, The Bail Project was unlikely to be able to demonstrate that the statute was unconstitutional as irrational. (*Id.* a 15-16).

The Bail Project argued that HEA 1300 was also unconstitutional because it vested standardless discretion in the Commissioner in violation the First Amendment. (Dkt. 26 at 15-17 and n.7). The Commissioner did not respond separately to this argument and The Bail Project argued that the Commissioner had waived any opposition to this argument. (Dkt. 32 at 4). The district court found it was not necessary to resolve the waiver issue as The Bail Project's argument concerning unfettered discretion was dependent on its payment of bail being expressive conduct—an issue that the court resolved against The Bail Project. (Order, S.A. at 17-18). The district court therefore held that The Bail Project was not likely to prevail on this claim.

Inasmuch as the district court concluded that The Bail Project had not shown a likelihood of success on the merits, it did not find it necessary to consider whether the other preliminary injunction factors were met. (*Id.* at 19 n.7).

## SUMMARY OF THE ARGUMENT

1.　　The district court erred in concluding that The Bail Project's payment of cash bail does not implicate the First Amendment as its payment of bail is expressive conduct, fully protected by the First Amendment. Conduct that is imbued with communicative elements falls within the scope of the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). In such a case, a law that targets conduct because of its expressive characteristics is content-based and therefore must satisfy strict scrutiny to be constitutional. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984); *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1305-06 (11th Cir. 2003). In order for conduct to be considered protected expression, the person or entity engaging in the conduct must intend the conduct to communicate a message, and the message, in its context, must be perceived by a reasonable viewer as communicative. *Clark*, 468 U.S. at 294. However, it is not necessary that the reasonable observer perceive a specific message; it is enough that the observer understand that a message is being conveyed, even if a "narrow, succinctly articulable message" is not perceived. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569 (1995).

In this case it is not contested that The Bail Project, by making bail payments, intends to communicate its essential advocacy message that cash bail

should be abolished. However, the district court erroneously concluded that The Bail Project's payment of bail would not be considered as communicative by the audience to whom it was delivered and therefore erred in holding that The Bail Project was not likely to prevail on its First Amendment claim.

In considering the audience to whom the communicative conduct is directed, both the context in which the expression occurs, and the surrounding circumstances must be considered. *Spence v. Washington*, 418 U.S. 405, 410-11 (1974). The audience must be assumed to have some knowledge of the general environment in which the expressive conduct occurs and the reasons for the expression. *Cressman v. Thompson*, 798 F.3d 938, 958 (10th Cir. 2015).

The reasonable observer with some knowledge of the "general environment" in which The Bail Project operates would understand that The Bail Project, as an organization, is paying cash bail for many persons. And while the reasonable observer might not know precisely why The Bail Project is paying the bail, he or she would understand it is doing so as part of its corporate mission. This applies to persons who are not involved with the bail process in the courthouses. Moreover, the staff of the clerks' offices understand that The Bail Project is paying the bail, is doing so as an organization that pays cash bail for many persons, and that the organization had been exempted by the state court judges from having costs removed from bail amounts, as normally could happen under Indiana law. In short, the staff with knowledge of the "general environment" regarding The Bail Project, would have a general understanding that The Bail Project's actions in paying bail

expressed something, even if a "narrow, succinctly articulable message" were not perceived. *Hurley*, 515 U.S. at 569. Nothing more is necessary for The Bail Project's conduct to be perceived as communicative. *Id.*

However, it is a mistake to focus only on persons outside of the clerks' offices or on the employees of the clerks as the sole or main audience for The Bail Project's expressive conduct. The analysis must consider the primary audience for the communicative conduct. The specific audience to whom The Bail Project's message is directed by its payment of cash bail includes the state court judges who determine whether a defendant will be released pending trial without the payment of bail, or whether the payment of bail will be required. In making this determination, the judges will be considering, among other things, "the source of funds or property to be used to post bail . . . insofar as it affects the risk of nonappearance." Ind. Code § 35-33-8-4(b)(8). A reasonable observer in the position of the judges would certainly understand that The Bail Project is paying cash bail, but also that by doing so The Bail Project is conveying a specific message—a message directed to the judges that cash bail is not necessary and should not be ordered. The Bail Project is engaging in expressive activity by paying cash bail.

2.      HEA 1300 contains no meaningful standards for the Commissioner to assess whether or not The Bail Project should be granted a license and whether it should be allowed to maintain a license. Instead, the statute vests the Commissioner with unbridled discretion as there are no neutral criteria guiding her decision. This also violates the First Amendment. *See, e.g., Church of the American Knights of the Ku*

*Klux Klan v. City of Gary, Indiana*, 334 F.3d 676, 681 (7th Cir. 2003).

3.     The statute is a content-based regulation of expressive conduct. It is content based because it targets particular speakers, charitable bail organizations, but not other persons or entities that may wish to communicate a message by paying bail for others. Restrictions that target particular speakers are content based. *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). It is also content based because it targets a particular form of expressive conduct and a particular message that the conduct delivers, allowing The Bail Project to pay judicially authorized cash bail for persons accused of certain offenses or with certain prior offenses, but not for other persons. The persons whom The Bail Project cannot represent are those charged with crimes of violence or who have pending felony charges and a past conviction for a crime of violence. But paying bail for these persons most effectively advances The Bail Project's advocacy.

As a content-based regulation of expressive conduct, HEA 1300 is presumptively unconstitutional and can be upheld only if it is narrowly tailored to serve a compelling governmental interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The Commissioner has not argued that the statute survives the scrutiny compelled by this standard and, regardless, the statute fails strict scrutiny.

Even if strict scrutiny is not applied, The Bail Project will be able to demonstrate that the statute violates the First Amendment. *O'Brien* provides that if conduct includes both speech and nonspeech elements, and its regulation is unrelated to the suppression of free expression, the regulation is constitutional if it

furthers an "important or substantial governmental interest" and "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 376-77. HEA 1300 also fails this intermediate scrutiny as the Commissioner did not satisfy her burden to demonstrate that there is an important or substantial governmental interest that justifies prohibiting The Bail Project from paying court-established bail for certain defendants, even though all other persons and entities may pay cash bail for these persons. There is no such interest.

4.    Finally, the district court erred in concluding that, regardless of its First Amendment deficiencies, The Bail Project will not be able to demonstrate that the classification created by HEA 1300 between those who are restricted in being able to pay judicially authorized cash bail, *i.e.* charitable bail organizations, and everyone else who may pay the bail, is rational. Given that The Bail Project only pays bail if a state court has considered all factors under Indiana law, including the source of any bail payment, and has set the amount of cash bail and any conditions to be imposed on a defendant's pre-trial release, denying The Bail Project the ability to pay the bail, while allowing all other persons and entities in the world to pay the bail, does not rationally further a legitimate governmental interest. *See, e.g., Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000-01 (7th Cir. 2006).

5.    As all the other requirements for the grant of a preliminary injunction are met, the district court's decision denying the preliminary injunction should be reversed and one should now be entered.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to grant or deny a preliminary injunction under the abuse of discretion standard." *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir. 1992) (citation omitted). However, the district court "abuses its discretion when it commits a clear error of fact or an error of law." *Id.* (citations omitted).

## ARGUMENT

To obtain a preliminary injunction, the plaintiff must first demonstrate that "(1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits." *Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (citations omitted). Once that is demonstrated, the district court is to balance the harms that will befall the plaintiff if the injunction is denied and the harm the defendant will suffer if it is granted. *Id.* (citations omitted). However, "the more likely [the preliminary injunction movant] is to win, the less the balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015) (citation omitted). "Finally, the court must ask whether the preliminary injunction is in the public interest." *Courthouse News*, 908 F.3d at 1068 (citation omitted).

In this case the district court concluded that The Bail Project was not likely to succeed on the merits of its claims. This was erroneous, and as all the other

requirements for the grant of a preliminary injunction are met, one should issue.

I.      The payment of bail by The Bail Project is expressive conduct protected by the First Amendment

While "[t]he First Amendment literally forbids the abridgement only of 'speech,'" the Supreme Court has emphasized that "conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Johnson*, 491 U.S. at 404 (internal quotation and citations omitted). A law that targets conduct because of its expressive nature may be upheld only if the government satisfies strict scrutiny, demonstrating that the law is narrowly drawn to further a substantial governmental interest. *Clark*, 468 U.S. at 294. *See also, e.g.*, *Fly Fish, Inc.*, 337 F.3d at 1305-06 ("[A] law that proscribes or limits conduct precisely because of its expressive component is content-based. These regulations draw strict scrutiny because they are aimed at the *suppression* of free expression.") (internal citation omitted) (emphasis by the court). The same is true, of course, of content-based regulations of speech, which are also "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 at 163 (internal quotations and citations omitted).

But not all conduct is deemed protected expression. A two-part test must be met: (1) the person or entity engaging in the conduct must intend the message delivered by the conduct to be communicative, and they must show that (2) the message "in context, would reasonably be understood by the viewer to be communicative." *Clark*, 468 U.S. at 294 (citations omitted). "[A] narrow, succinctly

articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley*, 515 U.S. at 569. It is enough that the viewer "would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphases in the original).

The district court properly found that "it's uncontested that The Bail Project's intent in paying cash bail is to communicate that a system of cash bail is unnecessary." (Order, S.A. at 11). However, the district court concluded that the audience viewing The Bail Project paying bail would not perceive the paying of bail as communicative. (*Id.* at 12-13). This is erroneous.

In determining the audience perceiving the message being delivered by The Bail Project, "context" is key. *Clark*, 468 U.S. at 294. The context includes the "surrounding circumstances" where the expression occurs. *Spence*, 418 U.S. at 410-11 (finding that hanging an American flag upside down with a peace symbol affixed to it was expressive conduct). The context and circumstances inquiry demands that the reasonable viewer must have some minimal knowledge. Thus in *Spence* the Court recognized that to those without knowledge "[a] flag bearing a peace symbol and displayed upside down . . . might be interpreted as nothing more than bizarre behavior" but given the circumstances of the times when the display of the flag occurred it was likely that it would be understood as a message by those observing

it. *Id*. In *Cressman v. Thompson, supra,* the court compared the reasonable viewer in a symbolic speech case to the reasonable observer in the Establishment Clause context, where it is "clear that this reasonable observer is not the everyday casual gawker." 798 F.3d at 958. "Similarly, in the symbolic-speech context, the reasonable person focuses on 'context [to] give meaning to [a] symbol' and is cognizant of the 'then-current domestic and foreign affairs of his government,' 'issue[s] of intense public concern,' the 'environment' in which an expressive act occurs, and the reasons for the speaker's expression.'" *Id.* (quoting *Spence*, 418 U.S. at 410) (alterations by the court). Context, and the knowledge that comes from context, is essential. "Context separates the physical activity of walking from the expressive conduct associated with a picket line or a parade; the act of sitting down to read at a library from sit-ins protesting segregation; and nude dancing from private dressing." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1343 (11th Cir. 2021) (internal quotation and citation omitted). Therefore, "[t]he circumstances surrounding an event help a reasonable observer discern the dividing line between expressive conduct and everyday conduct." *Id.* (internal quotation and citation omitted).

The district court concluded that the reasonable observers for The Bail Project's paying bail would be the clerk's office staff and any members of the public present when The Bail Project paid bail and they would not perceive the payment of bail as expressive conduct. (Order, S.A. at 12). This is wrong for a number of reasons.

The "reasonable observer—though not omniscient—would have a much broader awareness than the selective knowledge" than the district court attributed to them. *Cressman*, 798 F. 3d at 959. The Bail Project is not surreptitious about what it is doing. This is emphasized by the Commissioner's emergency rule that merely reiterates how The Bail Project has always acted and that requires charitable bail organization to "conduct the organization's business in such a manner that the public and those dealing with the organization shall be aware of the capacity in which the organization is acting." (*Supra* at 13). Certainly, there are many in the public who are not aware of The Bail Project. But the question is whether the reasonable observer who is aware of The Bail Project will perceive its payment of bail as expressive. In *NetChoice, LLC v. Attorney General, Florida,* 34 F.4th 1196 (11th Cir. 2022), the court recognized that when a social media platform "selectively removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in 'speech' within the meaning of the First Amendment." *Id.* at 1210. Of course, this "speech" is only conveyed to persons who are aware of what the platform is doing. These are the reasonable observers—those with some knowledge of the "surrounding circumstances."

This reasonable observer would know that The Bail Project, an organization, pays cash bail for persons as part of its mission, even if the observer were not sure of the precise message being delivered. This is enough for The Bail Project's act of paying bail to convey a message protected by the First Amendment as it is not

necessary that a "narrow, succinctly articulable message" be perceived. *Hurley*, 515 U.S. at 569.

Moreover, for the employees of the clerks' offices who interact with The Bail Project as it pays cash bail, the expressive nature of the conduct is clear. The employees of the clerk's office know that the bail is being paid by The Bail Project and that The Bail Project had been exempted from having costs taken out of the bail amounts (*supra* at 12). They know that The Bail Project regularly pays cash bail for many persons, and they certainly understand, as reasonable persons with a modicum of knowledge, that The Bail Project is paying significant amounts of cash bail, even though it is a stranger to the defendants. This modicum of knowledge might include awareness of The Bail Project's specific purpose in paying bail. But even without this knowledge, they necessarily know that The Bail Project's action in paying bail expresses something, even if they also do not perceive a "narrow, succinctly articulable message." *Id.*

The analysis of context and circumstances requires that attention be focused on the intended audience of The Bail Project's expressive conduct of paying bail. *See, e.g., Porter v. Gore*, 517 F. Supp. 3d 1109, 1125 (S.D. Cal. 2021), *appeal pending*, No. 21-55149 (9th Cir.) (plaintiff's honking to support demonstrators was "intended to convey a particular message which had a great likelihood to be understood by the audience") (citation omitted). This audience certainly includes the judges who have the power to release defendants from pretrial detention and the ability to determine that the defendants should be released without bail. And there

is no doubt that this all-important audience is well aware that The Bail Project is making an expressive statement by repeatedly paying cash bail.

The district court rejected this argument, concluding that "it is The Bail Project's subsequent speech, rather than the act of paying cash bail, that informs those judges of its message." (Order, S.A. at 12). It is certainly true that The Bail Project files reports and other information with the state court judges so that the judges are aware of The Bail Project's activities. And it is also true that the fact that conduct needs to be explained is "strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection under" the First Amendment. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006). But "this language  . . . does not mean that conduct loses its expressive nature just because it is also accompanied by other speech." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243-44 (11th Cir. 2018).

This is not a situation where the conduct of The Bail Project has to be explained. Its payment of cash bail, even without the reporting, stands on its own. It is the first step in its individual-by-individual advocacy designed to demonstrate that cash bail is unnecessary. It is the statement that it is making to its audience, including its most important intended audience—the judges making pre-trial release determinations. And, even without reports and notices, the judges are aware of the what The Bail Project is doing. After all, in their pretrial release and bail determinations, the judges are considering "the source of funds or property to be used to post bail." Ind. Code § 35-33-8-4(b)(8).

The fact that judges are made aware of The Bail Project's advocacy, not just by the organization's payment of bail, but by reports, entries on docket sheets, court appearances, or in any other way is part of the context and circumstances of how the message is reasonably perceived. If the flag in *Spence* was viewed exclusively by persons who had no idea what it was, it could not be argued that expressive conduct had occurred because no one would understood the flag to be anything except a piece of cloth with a design on it.[5] The "surrounding circumstances," *Spence*, 418 U.S. at 411, would be such that the intended audience would not understand that it had an expressive purpose, regardless of the subjective intent of the person displaying the flag. But here, it is clear that the payment of bail by The Bail Project is intended to convey a message "and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it"—particularly the state court judges. *Id.* The judges see The Bail Project's expressive conduct in various ways, which merely confirms the expressive nature of the conduct.

To support its holding the district court cites to this Court's decision in *Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017) (Order, S.A. at 12-13). In *Tagami* a woman who had been cited for violating an ordinance for exposing her

---

[5]     This is analogous to a case that the district court cited to support its decision, *Clancy v. Office of Foreign Assets Control*, 559 F.3d 595 (7th Cir. 2009). (Order, S.A. at 12). In *Clancy,* the plaintiff claimed that his desired travel to Iraq was symbolic conduct protected by the First Amendment and therefore the federal ban on such travel was unconstitutional. *Id.* at 605. In rejecting this claim this Court held that there was no audience for his expressive conduct as no one observing his travel would recognize that he was engaging in symbolic speech. *Id.* However, here the reasonable observers of The Bail Project's conduct—the payment of bail—will understand that its payment of bail is intended to be expressive.

breasts in public claimed that the ordinance violated the First Amendment. *Id.* at 377. This Court rejected the plaintiff's argument that her public nudity was protected expressive conduct given that there were no facts from "which it might reasonably be inferred that onlookers would have readily understood that this public display of nudity was actually a political protest against the City's public-indecency ordinance." *Id.* at 378. The point is that the intended audience, the general public, would not perceive the plaintiff "walking about the City of Chicago unclothed from the waist up" as engaging in expressive conduct. *Id.* at 377. But necessarily a different audience produces a different analysis. Indeed this Court has noted that "parading in public wearing no clothing at all can, depending on the circumstances, convey a political message." *Brandt v. Board of Educ. of Chicago*, 480 F.3d 460, 465 (7th Cir. 2007) (citations omitted). The audience—the context— must be considered. In this case, the audience, most importantly the judges setting the bail, will certainly understand that by paying the cash bail, The Bail Project is engaging in expressive activity.

The district court therefore erred in holding that The Bail Project's payment of cash bail is not expressive conduct subject to First Amendment strictures.

II.    The district court erred in concluding that The Bail Project was not likely to succeed in its claims that HEA 1300 violates the First Amendment because it is unconstitutionally vague and because it unconstitutionally impinges on The Bail Project's expressive conduct

   A.    HEA 1300 is unconstitutional because it vests in the Commissioner standardless discretion as to the licensing of charitable bail organizations

   Having concluded, erroneously, that The Bail Project's payment of bail is not

protected by the First Amendment, the district court did not address the substance of The Bail Project's vagueness challenge to the licensing provisions of HEA 1300, instead holding that The Bail Project's vagueness challenge was not well taken because the payment of bail by The Bail Project was not expressive conduct. (Order, S.A. at 17-18).[6] However, as demonstrated above, this was erroneous, and the district court erred in failing to consider the challenge and in failing to hold that the standards contained in HEA 1300 for the licensing of charitable bail organizations are devoid of substance and delegate overly broad, and unconstitutional, discretion to the Commissioner.

As noted, Indiana Code § 27-10-2-4.5(f) provides that:

the commissioner shall, deny, suspend, revoke, or refuse to renew certification for any of the following causes:

\*                     \*                     \*

(7)     When, in the judgment of the commissioner, the certificate holder has, in the conduct of affairs under the certification, demonstrated:

(A)     incompetency or untrustworthiness;
(B)     conduct or practices rendering the certificate holder unfit to carry on charitable bail activities or making the certificate holder's continuance detrimental to the public interest; or
(C)     that the certificate holder is no longer in good faith carrying on as a charitable bail organization;

and for these reasons is found by the commissioner to be a source of detriment, injury, or loss to the public.[7]

---

[6]     The Commissioner did not specifically address the vagueness argument.

[7]     In the district court The Bail Project argued that despite the fact that the Section 7 states that it applies to "the conduct of affairs under the certification," given that it is introduced by the phrase "[t]he commissioner shall deny, suspend, revoke, or refuse to renew certification for any of the following causes," *id.*, it is clear that subsection (7) applies

It is undisputed that the terms incompetency, untrustworthiness, and conduct or practice rendering a person unfit are not defined anywhere in the statute. (Embree, Dkt. 25-1 at 23:20 – 25:11). This is all explicitly left to the "judgment" of the Commissioner. Ind. Code § 27-10-2-4.5(f)(7) (*see also* Embree Dkt. 25-1 at 26:12-14). Allowing First Amendment expression to depend on the standardless judgment of an official offends the Constitution.

The Supreme Court has long recognized "that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) (citing cases). The Court has evinced "hostility to regulations of speech that allow broad discretion ('unbridled discretion' is the favored formula) to the regulators." *Church of the American Knights of the Ku Klux Klan*, 334 F.3d at 681 (collecting Supreme Court cases). To be constitutional, "discretion must be guided by objective, workable standards." *Minnesota Voters Alliance v. Mansky*, –U.S.–, 138 S. Ct. 1876, 1891 (2018). There must be "neutral criteria." *Lakewood*, 486 U.S. at 760.

Here, there are no neutral criteria governing the Commissioner. What is

---

both to current certificate holders and to those aspiring to obtain a certificate. (Dkt. 26 at 15 n.6). The Commissioner did not indicate how it would interpret the statute; a point noted by the district court. (Order, S.A. at 17 n.6). In any event, even if the part of the statute only applies after initial certification, it would allow the Commissioner to immediately revoke the certification and The Bail Project has standing to challenge it now. *See, e.g. Freedman v. Maryland*, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression, it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, . . . whether or not he applied for a license.").

"incompetency," "unfitness," or "untrustworthiness"? What is a "detriment, loss, or injury to the public"? Who knows? It certainly cannot be presumed that the Commissioner "will act in good faith and adhere to standards absent from the [statute]'s face [as] this is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. Moreover, even if the Commissioner acts with the best of intentions, "incompetency," "unfitness," "untrustworthiness," "detriment," and "loss" are completely subjective concepts, and First Amendment rights cannot be compromised by using such uncertain standards.

The district court therefore erred in concluding that The Bail Project was not likely to prevail on its claim that the unbridled licensing discretion granted to the Commissioner by HEA 1300 is unconstitutional.

B.     HEA 1300 violates the First Amendment in that it targets only charitable bail organizations such as The Bail Project and no other entities engaged in similar expressive conduct, and it limits for whom The Bail Project can engage in its expressive conduct of paying bail

1.     HEA 1300 is content based and does not survive strict scrutiny

The most rigorous scrutiny under the First Amendment is reserved for content-based regulations of expression. This is because "a government . . . has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed*, 576 U.S. at 163 (internal quotations and citations omitted). "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin, Texas v. Reagan National Advertising of Austin, LLC*, –U.S.–, 142 S.

Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. at 163). Additionally, a law is content based if it "distinguish[es] among different speakers, allowing speech by some but not others . . . [as] [s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340.

HEA 1300 is content based for two reasons. First, the statute is targeting a particular speaker—charitable bail organizations. If an unincorporated club, charity, or community group that is not a "business entity" under the Internal Revenue Code or Indiana law,[8] wishes to replicate the work of The Bail Project and exercise its First Amendment rights by deciding to pay bail, it may do so without restriction or limitation, as HEA 1300 does not reach its conduct. Moreover, even a business entity or nonprofit organization may pay bail for an unlimited number of persons if it does not "exist for the purpose of paying cash bail for another person." Ind. Code § 27-10-2-4.5(1). It is only the "charitable bail organization"—which exists to pay bail—that is targeted and restricted. Indeed, all other persons and organizations may pay cash bail for anyone approved for bail by a court. A law that distinguishes between speakers, as HEA 1300 does, is content based. *See, e.g.,*

---

[8]     The term "business entity" in Indiana Code § 27-10-2-4.5(a)(1) is not defined. Elsewhere in the Indiana Code it is defined as "a corporation, nonprofit corporation, limited liability company, limited liability partnership, limited partnership, business trust, real estate investment trust, or any other entity that is formed under the requirement of applicable Indiana law." Ind. Code § 26-2-8-102(3) (Uniform Electronic Transactions Act). Federal regulations, 26 C.F.R. § 301.7701-2, specify that "a business entity is any entity recognized for federal tax purposes (including an entity with a single owner that may be disregarded as an entity separate from its owner under § 301.7701–3) that is not properly classified as a trust under § 301.7701–4 or otherwise subject to special treatment under the Internal Revenue Code." Neither definition would include, for example, a group of friends or an informal community group that decide to pay bail for persons they deem to be deserving of their attention.

*Surita v. Hyde*, 665 F.3d 860, 870 (7th Cir. 2011) ("Restrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based.") (citation omitted).

Second, HEA 1300 targets a particular form of expressive conduct. It allows The Bail Project to pay bail for persons accused of certain offenses or with certain prior offenses, but not for persons accused of crimes of violence or persons charged with felonies who have past convictions of crimes of violence. Yet, it is the payment of bail for these persons, charged with more serious crimes, that most effectively advances The Bail Project's advocacy efforts. (Gaspar, Dkt. 25-2 ¶¶ 46-48). In other words, once licensed, The Bail Project is permitted to convey the message that cash bail is unnecessary for many low-level offenders but is not permitted to convey the message that it is unnecessary for persons charged with crimes of violence, or charged with felonies with previous convictions for crimes of violence.

The expression of The Bail Project is therefore being regulated based on "the topic discussed or the idea or message expressed," which is by definition a content-based regulation of expression. *City of Austin,* 142 S. Ct. at 1471 (internal quotation and citation omitted). Thus, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), concerning the constitutionality of a statute that prohibited certain forms of expert advice or assistance to a foreign terrorist organization, the Court recognized that "[t]he law here may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. The Court deemed the law to be content based

as it allowed for some conduct, but prohibited other forms of conduct. *Id.* at 27. Therefore, the Court found that the law was subject to scrutiny more demanding than the intermediate scrutiny set out in *O'Brien. Id.* at 28.

As a content-based regulation of expressive conduct, HEA 1300 can be upheld only if it is narrowly tailored to serve a compelling governmental interest. In identifying a compelling interest, the Commissioner "must specifically identify an 'actual problem' in need of solving." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 822-23 (2000)). "[C]onclusory statement[s]" are not enough. *Playboy*, 529 U.S. at 822. The Commissioner cannot rely on "anecdote and supposition." *Id.*

The Commissioner offered no argument at all in the district court that HEA 1300 satisfies strict scrutiny. Nor could she. While the State of Indiana undoubtedly has a general interest in bail determinations, the decision as to who is provided pre-trial release and under what circumstances is not The Bail Project's decision and is not affected by HEA 1300. The Bail Project becomes involved only after a court has determined that pre-trial release is appropriate and has set a bail amount. At that point, every person in Indiana and elsewhere, with the exception of charitable bail organizations, may pay bail for that person, whether they be charged with the lowest misdemeanor or the most severe felony. Singling out charitable bail organizations as the only persons or entities who cannot pay court-established bail for certain persons simply is not narrowly tailored to serve any compelling interest and as noted, the Commissioner does not argue to the contrary.

2.        HEA 1300 also fails the intermediate scrutiny demanded by *O'Brien*

In *O'Brien,* the Court held, in response to O'Brien's argument that burning his selective service registration card was protected symbolic speech, that if "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech elements can justify incidental limitations on First Amendment freedoms." 391 U.S. at 376. A governmental regulation of conduct that has both speech and nonspeech elements is justified if "it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 376-77. This is described as "intermediate scrutiny." *Foxxxy Ladyz Adult World, Inc. v. Village of Dix, Ill.*, 779 F.3d 706, 711 (7th Cir. 2015) (citation omitted).

The district court concluded that even assuming that The Bail Project's actions in paying bail are imbued with sufficient communicative content to justify some First Amendment protection under *O'Brien*, The Bail Project is nevertheless unlikely to succeed on the merits of its claim because "The Bail Project has not shown . . . that there can be no important interest in regulating charitable bail organizations." (Order, S.A. at 14). The district court's holding contains a number of errors, even ignoring the fundamental error of concluding that HEA 1300 is not a content-based restriction intended to suppress the expression of charitable bail

organizations.

As an initial point, The Bail Project is not responsible for carrying any burden here. "It is well established that the party seeking to uphold a restriction on . . . speech carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (internal quotation and citation omitted) (referring to the intermediate scrutiny to which commercial speech is subject). *See also, e.g.*, *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994) (noting that the government "bears the burden of showing that the remedy it has adopted does not burden substantially more speech than is necessary to further the government's legitimate interests." (internal quotation and citation omitted). Therefore the burden to show that HEA 1300 "satisfies intermediate scrutiny falls on the government." *Cornelio v. Conn.*, 32 F.4th 160, 171 (2nd Cir. 2022) (citation omitted).

Intermediate scrutiny does not allow the government to theorize potential reasons for the statute. Instead "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures." *Turner*, 512 U.S. at 666 (internal quotation and citation omitted) (alteration by the Court). This means that the Commissioner "must establish that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate those harms in a direct and material way." *Id.* at 664.

The Commissioner has argued that HEA 1300 serves the State's interest in ensuring that those who are charged with more serious offenses "are not bailed out by organizations ill-equipped to apprehend and return defendants to court" and that "charitable bail organizations lack the same familial ties and financial incentives as others in the industry because they stand to lose only other people's money, which could be at the expense of the safety of the public as they conduct their social experiment." (Dkt. 29 at 20). The Commissioner has no empirical evidence, nor does she demonstrate "sound reasoning" to support these theorized harms.

The rationale advanced by the Commissioner flies in the face of the reality of bail in Indiana. Once a criminal court judge in Indiana decides that cash bail may be paid, anyone can pay it. There is no consideration made as to whether the private-party payor is equipped to apprehend the person and return them to court, and that is certainly not an expectation of other payors of cash bail who all run the risk of having their cash amounts forfeited if the defendant does not appear. *See, e.g.*, *O'Laughlin*, 549 N.E.2d at 1042. Every person or entity that pays bail has an economic incentive that the bail not be forfeited and an interest in ensuring that the defendant returns to court.

The Commissioner's argument also flies in the face of the uncontested facts of this case. As noted, The Bail Project's clients, aided by the services provided as part of the organization's Community Release with Support program, have an extremely high rate of appearing for their court hearings. (*Supra* at 11-12). And even when their clients are convicted, they rarely are sentenced to more than the time that

they have already served, thus demonstrating the benefit of allowing them to be released on bail. (*Supra* at 12).

The Commissioner seeks to minimize The Bail Project's interest by stating that it is using "other people's money." This is simply not true. The Bail Project is operating with its money, money it raises and maintains in its National Revolving Bail Fund—not unlike any nonprofit whose operations are to any extent donor-funded. Indeed, given that The Bail Project depends on the ability to get cash bail returned to it so that it can demonstrate that cash bail is unnecessary and so that the bail money may be recycled to pay bail for other persons, The Bail Project has an enormous incentive to ensure that their clients return to court, and their clients return to court at an extremely high rate.

Bail is set with the assumption that once paid the person will return to court. Indeed, the bail factors considered by the state court are explicitly designed to determine if the defendant poses an unreasonable risk of failing to appear for future proceedings, including considering the source of funds for the payment of bail. Ind. Code § 35-33-8-4(b)(8). If a criminal court thinks the risk is too high, it simply will not allow pretrial release. And, if the State, a party to every criminal proceeding, believes that it has legitimate concerns about whether a defendant will appear, its recourse is to ask the trial court not to allow pretrial release—not to severely restrict who can pay any court-established bail after the release determination has been made. The justifications by the Commissioner boil down to an argument that Indiana has an important and substantial interest in denying bail opportunities to

persons who have been allowed bail by a state court.[9] The State does not have an interest in supervising or circumventing state court decisions in this way. The statute fails intermediate scrutiny.

\* \* \*

HEA 1300 therefore impinges, without justification, on The Bail Project's First Amendment rights. The district court erred in finding that The Bail Project would not prevail on its First Amendment claim.

III.   The district court erred in concluding that HEA 1300 did not violate the Bail Project's equal protection rights

There is no doubt that HEA 1300 establishes two classes of possible bail payors. One class is made up solely of charitable bail organizations, the only potential one of which in Indiana is The Bail Project. HEA 1300 severely limits the ability of the bail payors in this class to pay bail in that the statute prohibits charitable bail organizations from paying bail for persons accused of an offense defined as a crime of violence or who are charged with felonies and have a past conviction, in Indiana or elsewhere, of a crime of violence. In the other class is every other person or entity in Indiana and the rest of the world, all of whom are able to pay cash bail for anyone and everyone for whom an Indiana court has granted bail.

---

[9]      The district court, albeit unintentionally, emphasizes this point by noting that "The Bail Project has not discussed, for example, what steps it takes, if any, to ensure the safety of the community, or explained why Indiana doesn't have in interest in ensuring that charitable bail organizations consider the severity of the charged conduct or prior convictions." (Order, S.A. at 14-15). Aside from the fact that it is not The Bail Project's burden to demonstrate anything, and the obligations presumed by the district court are not imposed on any other persons or entities, the persons that The Bail Project serve have been granted bail, meaning that a state court has determined that they may be released on bail after applying all factors "relevant to the detainee's risk of nonappearance and potential danger to the community." *DeWees*, 180 N.E.3d at 266. (*See also* note 1, *supra*).

The Bail Project argued to the district court that even without considering its First Amendment rights, the discrimination imposed by HEA 1300 violates equal protection. The district court disagreed. (Order, S.A. at 15-16). The district court erred.

When a discriminatory classification does not classify persons by a suspect class or impinge on a fundamental right, it cannot be sustained unless it rationally furthers a legitimate governmental interest. *Vision Church*, 468 F.3d at 1000-01. Admittedly, this low-level scrutiny is not rigorous, but it is not meaningless. Indeed, there are numerous examples where the Supreme Court has found that governmental action fails to satisfy this standard. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 626-35 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-50 (1985); *Plyler v. Doe*, 457 U.S. 202, 223-30 (1982); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-38 (1973). As this Court has noted, "[r]ational basis review favors the State but does not ensure an automatic win." *Hope v. Comm'r of Indiana Dep't of Correction,* 9 F.4th 513, 529 (7th Cir. 2021) (en banc).

The Commissioner has argued that the discrimination meted out by HEA 1300 is justified because "the General Assembly has a legitimate interest in regulating major actors in the bail industry differently based upon their distinct responsibilities and accountability in the criminal justice system." (Dkt. 29 at 22). The Bail Project agrees that this concern may justify licensing of charitable bail organizations, provided the licensing standards are constitutional. However, the disparate treatment imposed by HEA 1300 is not regulatory; it is prohibitory.

Because of the prohibitions on for whom The Bail Project may pay court-approved bail, it is not able to serve at least 45% of its potential clients. It is not able to serve these persons charged with serious crimes, or who have been convicted of such crimes in the past and who are currently charged with felonies, even though they are undoubtedly most in need of The Bail Project's services.

The question therefore is not whether it is rational, in the most general of terms, to regulate charitable bail organizations, *i.e.*, The Bail Project. The question is whether it is rational to prohibit charitable bail organizations, and only charitable bail organizations, from paying bail after an Indiana trial court has granted bail to a defendant. The district court stated that Indiana's General Assembly could reasonably assume that an organization such as The Bail Project is "likely to have policy preferences different than its own." (Order, S.A. at 16). Perhaps the General Assembly has a policy preference that certain persons should not be admitted to bail. But once a criminal court grants bail to a defendant, the policy preferences of the General Assembly as to who can receive bail are not relevant. The only question is whether it is rational to allow everyone in Indiana except The Bail Project to pay that person's bail.

The district court accepted the Commissioner's argument that it is rational to treat The Bail Project differently because, unlike bail agents, charitable bail organizations are not "charged with surrendering a defendant to the court." (Dkt. 29 at 23), and the General Assembly "could reasonably be concerned that without regulation, charitable bail organizations wouldn't have the financial accountability

and incentives that the statutory scheme otherwise assumed were present." (Order, S.A. at 16). It is unclear what the Commissioner means about "financial accountability." Unlike bail bond agents who take other persons' money and purchase or write an insurance policy for the amount of the bail, The Bail Project uses its own funds for the bail. If the cash is not posted, the bail is not paid. So there is no issue of financial accountability.

It is true that The Bail Project is not charged with surrendering persons to court who fail to appear. But of course, no one who pays cash bail is charged with surrendering defendants to a court upon their failure to appear for hearing. But, as noted above, The Bail Project has a strong financial incentive to ensure that its clients return to court. Its ability to pay bail for persons around the country is dependent on this as the success of its advocacy against cash bail is dependent on it.

Again, what the Commissioner is arguing is that she has the right to prohibit certain persons from paying cash bail after a state court complies with the Indiana Constitution, Indiana Code, and the Indiana Rules of Criminal Procedure and determines that the person should be admitted to bail. And this compliance specifically entails the state court considering "the source of funds and property to be used to post bail . . ., insofar as it affects the risk of nonappearance." Ind. Code § 35-33-8-4(b)(8). There simply is no rational reason for The Bail Project to be denied the ability to pay bail for a significant subset of persons granted bail, even though every other person or entity in Indiana can pay that bail. The Bail Project is therefore likely to prevail on its equal protection claim.

IV.    The other requirements for the grant of a preliminary injunction are met here

Having erroneously found that The Bail Project was not likely to succeed on the merits of its claims, the district court did not determine whether the other requirements for the grant of a preliminary injunction were met. (Order, S.A. at 19 n.7). The Commissioner also did not respond to The Bail Project's arguments in the district court that the other requirements for the grant of a preliminary injunction, aside from probability of success on the merits, were met. (Dkt. 29 at 23). It is axiomatic that "[f]ailure to respond to an argument—as the [Commissioner has] done here—results in waiver," and any arguments that she might have concerning these other factors have been waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). In any event, the other factors are certainly satisfied.

A.    The Bail Project is facing irreparable harm for which there is no adequate remedy at law

The Bail Project is threatened with the possibility of not being granted a license to operate in Indiana and, even if that license is granted, of having its advocacy efforts – the payment of cash bail for clients—severely curtailed. The Bail Project is likely to be able to demonstrate that HEA 1300 violates its First Amendment rights. And it is clear that "the loss of First Amendment freedoms, even for minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The same is true for violations of equal protection. *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 738-39 (S. D. Ind. 2016) (citing cases), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

This Court has stressed that the "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Similarly, money damages are not sufficient to rectify the irreparable injury that The Bail Project faces.

B.     The balance of harms favors The Bail Project

In *Christian Legal* Society, this Court held that a governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *Id.* at 867 (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The same is true here.

Moreover, an injunction will merely allow The Bail Project to pay bail that has been established by a criminal court in the same manner that everyone else in Indiana and elsewhere may pay judicially approved bail. There can be no harm to the Commissioner or State of Indiana from that.

C.     The public interest will not be disserved by the grant of a  preliminary injunction

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. The same is true of protecting equal protection rights as "[s]urely, upholding constitutional rights serves the public interest." *Joelner v. Village of Washington Park*, *Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (internal quotation marks and citation omitted).

Moreover, it is difficult to see why allowing The Bail Project to pay bail for

persons already admitted to bail, for whom others can pay bail, would negatively impact the public. Indeed, given that the payment of bail allows persons to remain as productive society members, rather than languishing in jail, the public interest is served by allowing persons to be released after a state court determines it is appropriate to do so.

D.      The preliminary injunction should issue without bond

While Federal Rule of Civil Procedure 65, by its terms, requires that a preliminary injunction be accompanied by "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), no bond should be required in the absence of the possibility of any monetary injuries. *See, e.g., Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (noting cases that "allow a district court to waive the requirement of an injunction bond [where] the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction"). A preliminary injunction here will simply allow The Bail Project to spend its own money. There is no risk of monetary damages to anyone if the injunction is granted.

## CONCLUSION

The district court erred in finding that The Bail Project is not likely to prevail on the merits of its claims. All the other requirements for the grant of a preliminary injunction are satisfied and one should be ordered enjoining the enforcement of HEA 1300 against The Bail Project.

/s/ *Kenneth J. Falk*
Kenneth J. Falk
Counsel of Record
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Appellant

## Certificate of Compliance

I hereby certify that this brief conforms to Circuit Rule 32.

1.      This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 13,473 words based on the "Word Count" feature of Microsoft Word.

2.      This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Schoolbook font for the body of the brief and 11-point font for footnotes.

/s/ *Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law

**Certificate of Service**

I hereby certify that on the 15th day of August, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Service will be made on all ECF-registered counsel by operation of the Court's electronic system.

/s/ *Kenneth J, Falk*
Kenneth J. Falk
Attorney at Law

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE BAIL PROJECT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00862-JPH-MJD |
| | ) | |
| COMMISSIONER, INDIANA | ) | |
| DEPARTMENT OF INSURANCE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

The Bail Project is a nonprofit organization that pays cash bail for pretrial defendants.  A new Indiana law, House Enrolled Act 1300, would require The Bail Project to be certified with the Indiana Department of Insurance and preclude it from paying cash bail for certain defendants.

The Bail Project alleges that HEA 1300—which becomes effective July 1, 2022—violates the First Amendment's right to free speech and the Fourteenth Amendment's Equal Protection Clause.  The Bail Project has filed a motion for a preliminary injunction that would prevent the Department of Insurance from enforcing HEA 1300 against it.  Because The Bail Project has not shown a likelihood of success on the merits justifying a preliminary injunction, that motion is **DENIED**.  Dkt. [6].

**I.**
**Facts & Background[1]**

**A. Pretrial Release in Indiana**

Indiana law "strongly encourages pretrial release for many accused individuals awaiting trial." *DeWees v. State*, 180 N.E.3d 261, 268 (Ind. 2022) (citing Ind. Cr. R. 26).  Accordingly, "if a defendant presents no 'substantial risk of flight or danger' to others, the [state] court must consider releasing the defendant without money bail or surety." *Id.* (quoting Ind. Code §§ 35-33-8-3.2(a); 35-33-8-3.8(a)).

The state court may decide, however, that a risk of flight or risks to public safety require money bail. *Id.* at 267–68.  That money bail can be a surety bond, which requires a partial payment (usually 10 percent of the bail amount) to a bail-bond agent.  Dkt. 25-1 at 11–12 (Embree Dep.).  Or it can take the form of cash bail, which requires a full payment. *Id.*  Generally, anyone can pay cash bail for a defendant. *Id.* at 8.

**B. The Bail Project**

The Bail Project is a nonprofit corporation "committed to advocating for an end to cash bail and the system of conditioning a person's pretrial release from confinement upon the payment of money."  Dkt. 25-2 at 1 (Gaspar Decl.). It believes that cash bail "will often be impossible for an indigent accused person to pay," resulting "in significant and potentially permanent disruption of

---

[1] By agreement of the parties, there has been limited discovery and no evidentiary hearing.  *See* dkt. 16; dkt. 17.  The Court therefore bases these facts on the written record, including the complaint and designed evidence.

the lives of individuals accused of a crime and that of their families, and further prolongs the cycle of poverty that entraps persons." *Id.* at 2.

Because of those beliefs and the presumption of innocence, and to show that "bail is not necessary to ensure court appearances," The Bail Project pays cash bail "at no cost" to its clients. *Id.* at 2–4. It also provides what it calls "Community Release with Support" to help clients by providing "reminders about court dates, transportation assistance, and voluntary referrals to social services and community resources." *Id.* at 3. The Bail Project provides these services in twenty states and has supported "more than 22,000 low-income persons" in appearing for over 72,000 court dates, "for a 92% appearance rate." *Id.* In Indiana, The Bail Project "has assisted approximately 1,000 pretrial defendants" in Marion and Lake Counties. *Id.* at 5–6.

In short, "The Bail Project's goal is to eliminate the need for its existence by demonstrating through its expressive advocacy of paying cash bail that bail is not necessary to ensure that persons appear for court appearances." *Id.* at 4. It "views this form of advocacy as far more persuasive than a rally, a social media post, a rented billboard, or contributing to political candidates." *Id.* at 5.

### C. House Enrolled Act 1300

In early 2022, the Indiana General Assembly passed, and Governor Holcomb signed into law, House Enrolled Act 1300 (to be codified at Ind. Code § 27-10-2-4.1 et seq. (eff. July 1, 2022)). *See* dkt. 1 at 3–4. HEA 1300 requires the Indiana Department of Insurance's commissioner to regulate "a charitable bail organization," which is defined as a business entity or nonprofit

organization "that exists for the purpose of paying case bail for another person."[2]  Ind. Code §§ 27-10-2-4.1; 27-10-2-4.5(a).

HEA 1300 also outlines when a charitable bail organization may apply for certification, and when the commissioner should certify the applicant:

> (b) The commissioner may certify a charitable bail organization if the charitable bail organization:
>> (1) is a business entity, or a nonprofit organization under:
>>> (A) the Internal Revenue Code; or
>>> (B) Indiana law;
>> (2) is currently registered to do business in Indiana;
>> (3) is located in Indiana; and
>> (4) exists for the purpose of depositing cash bail for an indigent defendant who:
>>> (A) is not charged with a crime of violence; or
>>> (B) if charged with a felony, does not have a prior conviction for a crime of violence.
>
> (c) A person may apply for certification under this section in accordance with rules adopted under this section.
>
> (d) The commissioner shall certify a person as a charitable bail organization if the:
>> (1) person pays an application fee of three hundred dollars ($300);
>> (2) person meets the requirements of this section; and
>> (3) person, including an officer or director of the person, has not engaged in conduct that:
>>> (A) constitutes fraud, dishonesty, or deception;

---

[2] HEA 1300 includes exceptions, not relevant here, if bail is paid for fewer than three people in a 180-day period or is paid for a relative.

S.A. 4

(B) constitutes malfeasance, misfeasance, or nonfeasance in dealing with money; or

(C) resulted in the suspension or revocation of a previous certification.

\*   \*   \*

(f) The commissioner shall deny, suspend, revoke, or refuse to renew certification for any of the following causes:

(1) Any cause for which issuance of the certification could have been refused had it then existed and been known to the commissioner.

(2) Violation of any laws of this state in the course of dealings under the certification;

(3) Material misstatement, misrepresentations, or fraud in obtaining the certification.

(4) Misappropriation, conversion, or unlawful withholding of money belonging to donors or others and received in the conduct of business under the certification.

(5) Fraudulent or dishonest practices in the conduct of business under the certification.

(6) Willful failure to comply with or willful violation of any proper order or rule of the commissioner.

(7) When, in the judgment of the commissioner, the certificate holder has, in the conduct of affairs under the certification, demonstrated:

(A) incompetency or untrustworthiness;

(B) conduct or practices rendering the certificate holder unfit to carry on charitable bail activities or making the certificate holder's continuance detrimental to the public interest; or

(C) that the certificate holder is no longer in good fair carrying on as a charitable bail organization;

5

and for these reasons is found by the commissioner to be a source of detriment, injury, or loss to the public.

(8) The listing of the name of the applicant or certificate holder on the most recent tax warrant list supplied to the commissioner by the department of state revenue.

(g) A charitable bail organization must comply with all of the following:

(1) if the charitable bail organization pays, or intends to pay, bail for more than three (3) individuals in any one hundred eighty (180) day period, the charitable bail organization must be certified by the commissioner under this section before soliciting or accepting donations for bail for another person, and before depositing money for bail for another person.

(2) A charitable bail organization may not pay bail for a defendant who:

(A) is charged with a crime of violence; or

(B) is charged with a felony and has a prior conviction for a crime of violence.

Ind. Code. § 27-10-2-4.5.

To summarize, the commissioner may certify a charitable bail organization if it exists to pay cash bail in Indiana, but not for defendants who (1) are charged with a crime of violence or (2) are charged with a felony and have a prior conviction for a crime of violence.[3]  *See* Ind. Code. § 27-10-2-4.5(b), (g).  The commissioner must also promulgate rules for applications, Ind. Code. § 27-10-2-4.5(c), but she has not yet done so, dkt. 25-1 at 21 (Embree

---

[3] HEA 1300 incorporates the definition of "crime of violence" in Ind. Code § 35-50-1-2(a); the included offenses are not relevant to this order.

S.A. 6

Dep).  HEA 1300 also explains the reasons why the "commissioner shall deny, suspend, revoke, or refuse to renew certification," including misrepresentations, fraud, dishonesty, incompetency, and detriment to the public interest.  Ind. Code § 27-10-2-4.5(f).

### D. Procedural History

Once HEA 1300 goes into effect, The Bail Project will have to be certified as a charitable bail organization to continue assisting defendants in Indiana. *See* dkt. 26 at 9.  Even if it becomes certified, The Bail Project would no longer be able to pay bail for defendants who are charged with a crime of violence or are charged with a felony and have been convicted of a crime of violence.  *Id.* at 9–10.  The Bail Project therefore brought this action, alleging that HEA 1300's restrictions violate (1) its right to free speech under the First Amendment and (2) the Fourteenth Amendment's Equal Protection Clause.  Dkt. 1 at 14–15.

The Bail Project has also filed a motion for a preliminary injunction under Federal Rule of Civil Procedure 65, requesting that the Court "enjoin[ ] the enforcement of HEA 1300 against The Bail Project."  Dkt. 26 at 25.

## II.
## Applicable Law

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021).  To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing.  *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

7

Determining whether a preliminary injunction is appropriate under Rule 65 involves a two-step inquiry, with a threshold phase and a balancing phase. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). At the threshold phase, the moving party must show that: (1) without the requested relief, it will suffer irreparable harm during the pendency of its action; (2) traditional legal remedies would be inadequate; and (3) it has "a reasonable likelihood of success on the merits." *Id.* "If the moving party cannot establish . . . these prerequisites, a court's inquiry is over and the injunction must be denied." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

If the movant satisfies the threshold requirements, the Court proceeds to the balancing phase "to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Whitaker*, 858 F.3d at 1044. This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

### III.
### Analysis

The Bail Project argues that it has shown that it is entitled to preliminary injunctive relief. *See* dkt. 26 at 12–25. The Commissioner disputes only likelihood of success on the merits, arguing that The Bail Project is not entitled to a preliminary injunction because it is unlikely to succeed on any of its

S.A. 8

claims.  *See* dkt. 29 at 23.  The Court therefore begins with evaluating The Bail Project's likelihood of success on each of its claims.

### A. First Amendment Expression

The Bail Project argues that by paying cash bail for defendants, it is engaging in free speech either as speech or as inherently expressive conduct. Dkt. 26 at 12–14, 16–22.  It therefore contends that HEA 1300 is an impermissible content-based regulation of activity that is protected under the First Amendment.  *Id.*  The Commissioner responds that HEA 1300 at most incidentally burdens protected speech because the act of paying cash bail is not speech or even inherently expressive conduct.  Dkt. 29 at 13–21.

### 1. Whether Paying Cash Bail is Speech

The Bail Project first argues that the payment of cash bail on behalf of individual defendants is "pure speech" because that action is "expending money to advocate for matters of interest."  Dkt. 26 at 12.  It relies primarily on Supreme Court precedent holding that certain limits on campaign contributions violate First Amendment protections for political speech.  *Id.* at 12–13.  The Commissioner responds that The Bail Project's bail payments are not the same because they are "neither express-advocacy-election spending nor direct spending for political speech."  Dkt. 29 at 16.[4]

The cases that The Bail Project relies on do not show that paying bail is speech.  *Citizens United v. Federal Election Commission* involved a challenge to

---

[4] The Bail Project drops this argument in its reply, arguing only that its actions are expressive conduct.  *See* dkt. 32 at 4–8.

S.A. 9

a law that expressly limited "expenditures for speech defined as an 'electioneering communication' or for speech expressly advocating the election or defeat of a candidate."  558 U.S. 310, 318–19 (2010).  So the donations at issue there—to a nonprofit for making a documentary about then-Senator Hillary Clinton—were aimed directly at speech.  *Id.* at 319, 339, 372 ("The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it.").  Similarly, *Meyer v. Grant* held that a ban on paying political-petition circulators "involve[d] core political speech" because engaging in political discussions through a petition is speech.  486 U.S. 414, 420–22 (1988).[5]  In short, as the Supreme Court recently repeated, campaigns necessarily involve "debate on public issues [that] should be uninhibited, robust, and wide-open," so restrictions on them implicate speech.  *Federal Election Commission v. Cruz*, 142 S. Ct. 1638, 1650–52 (2022).

The Bail Project has not argued that paying cash bail is directly attached to speech or explained how it could implicate speech or public debate in a similar way, so it has not shown a likelihood of success on this theory.  *See* dkt. 26 at 12–14.

### 2.  Whether Paying Cash Bail is Inherently Expressive Conduct

In addition to protecting actual speech, the First Amendment protects some conduct.  *Texas v. Johnson*, 491 U.S. 397, 403–04 (1989) ("[W]e have long

---

[5] The Bail Projects also cites *Holder v. Humanitarian Law Project*, but the Supreme Court there considered a regulation directly on speech (given the nature of plaintiffs' as-applied challenge), not whether providing financial support was speech rather than conduct.  561 U.S. 1, 28 (2010).

recognized that [the First Amendment's] protection does not end at the spoken or written word.").  But the First Amendment's protection "extends only to conduct that is '*inherently* expressive.'"  *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)).

Whether conduct is inherently expressive focuses on two questions. First, was there "an intent to convey a particularized message"?  *Johnson*, 491 U.S. at 404.  Second, was "the likelihood great that the message would be understood by those who viewed it"?  *Id.*

Here, it's uncontested that The Bail Project's intent in paying cash bail is to communicate that a system of cash bail is unnecessary.  *See* dkt. 25-2 at 4; dkt. 29 at 13–14; *but see Johnson*, 491 U.S. at 404 (explaining that conduct is not protected merely because "the person engaging in the conduct intends thereby to express an idea").  The parties disagree, however, on who the relevant audience is for The Bail Project's conduct and thus dispute whether "the conduct *itself* . . . can be readily 'understood by those who view it.'"  *Tagami*, 875 F.3d at 378 (quoting *Johnson*, 491 U.S. at 404).  The Bail Project argues that its audience is Indiana's criminal-court judges and that they understand The Bail Project's message—cash bail is unnecessary.  Dkt. 32 at 6–7.  The Commissioner argues that objective observers would not catch that message because they would see only "a financial transaction at the clerk's office—that same transaction that anyone paying another's bail . . . would

11

engage in, whether they objected to the cash bail system or not." Dkt. 29 at 14.

To determine the relevant audience, courts look to "those who viewed" the relevant conduct. *Johnson*, 491 U.S. at 404. So in *Tagami*, the Seventh Circuit considered whether onlookers "in public places around Chicago" would recognize that the plaintiff's toplessness was a protest against laws preventing "women from appearing bare-chested in public." 875 F.3d at 379. And in *Clancy v. Office of Foreign Assets Control*, the Seventh Circuit concluded that a "person observing Clancy's travels to Iraq would have no way of knowing" that he did so to protest the war there. 559 F.3d 595, 605 (7th Cir. 2009). Applying those precedents to the conduct here—paying cash bail for *individuals*, dkt. 32 at 6–7—the audience is the clerk's office staff and any members of the public present when The Bail Project employees come to deposit cash bail. *See* dkt. 25-2 at 5. And The Bail Project's individual payments do not communicate a message to an objective observer, just as in *Tagami*, 875 F.3d at 379, and *Clancy*, 559 F.3d at 605.

Moreover, even if Indiana's criminal-court judges were The Bail Project's audience for this First Amendment analysis, it would not have a likelihood of success on this claim. That's because it is The Bail Project's subsequent speech, rather than the act of paying cash bail, that informs those judges of its message. As The Bail Project admits, the judges learn of The Bail Project's actions from "The Bail Project filing quarterly reports and providing further information to the courts on demand." Dkt. 32 at 7. So "[t]he expressive

12

component" that the Bail Project ultimately relies on "is not created by the conduct itself but by the speech that accompanies it." *Rumsfeld*, 547 U.S. at 66.  In other words, the judges receive no message from The Bail Project's conduct, but from its later speech directly to them—speech that HEA 1300 does not regulate.  *See Tagami*, 875 F.3d at 378 ("To fall within [the inherently expressive conduct] doctrine, the conduct in question must *comprehensively* communicate its own message *without additional speech.*" (emphases added)).

Indeed, The Bail Project's intended message—that the cash bail *system* is unnecessary—requires the communication of additional, more comprehensive, information.  Dkt. 32 at 6–7; *see Tagami*, 875 F.3d at 378.  The Bail Project cannot transform its limited conduct into speech by following up with reports to a different audience.  *See Rumsfeld*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").  To be sure, expressive conduct does not forfeit its expressiveness just because it's accompanied by speech—consider someone who burns an American flag during an anti-American chant.  *See Johnson*, 491 U.S. at 399.   But when the speech is necessary explanation for the conduct, that's "strong evidence that the conduct here is not . . . inherently expressive." *Rumsfeld*, 547 U.S. at 66.

That is enough to end this analysis, because without expressive conduct, the First Amendment is not implicated.  *See Tagami*, 875 F.3d at 378.  But even "assum[ing] for the sake of argument" that the conduct here is "communicative enough to warrant some degree of First Amendment

13

protection," The Bail Project has not shown a likelihood of success on the

merits. *Id.* "When 'speech' and 'nonspeech' elements are combined in the

same course of conduct," courts apply an intermediate level of scrutiny under

*O'Brien*. *Id.* at 378–79 (quoting *United States v. O'Brien*, 391 U.S. 367, 376

(1968)). "Under the *O'Brien* test, a law survives First Amendment scrutiny" if:

> (1) The regulation is within the constitutional power of
> the government; (2) the regulation furthers an
> important or substantial government interest; (3) the
> governmental interest is unrelated to the suppression of
> free expression; and (4) the restriction on alleged First
> Amendment freedoms is no greater than essential to
> further the government's interest.

*Id.* at 378–79. The Bail Project argues only that Indiana has no "important or

substantial governmental interest" in regulating charitable bail organizations.

Dkt. 26 at 21–22; dkt. 32 at 9–11. The Commissioner responds that "Indiana

trial courts impose money bail in a complex system that must balance the

constitutional rights of defendants with the court's assessment of the

defendants' risk of flight and the safety of the community." Dkt. 29 at 20

(citing Ind. Code § 35-33-8-4(b)).

The Bail Project has not shown, at this preliminary-injunction stage, that

there can be no important interest in regulating charitable bail organizations.

While The Bail Project has a strong record of its clients appearing for court,

dkt. 25-2 at 3, it has not explained why that should be Indiana's only concern.

*See* dkt. 32 at 9–11. The Bail Project has not discussed, for example, what

steps it takes, if any, to ensure the safety of the community, or explained why

S.A. 14

Indiana doesn't have an interest in ensuring that charitable bail organizations consider the severity of the charged conduct or prior convictions. *See* Ind. Code. § 27-10-2-4.5(b), (g) (prohibiting charitable bail organizations from paying cash bail for defendants who are charged with a crime of violence or are charged with a felony after having been convicted of a crime of violence). The Bail Project has thus not shown a likelihood of success under *O'Brien*.

None of this, of course, criticizes The Bail Project's intent or mission, or casts doubt on the sincerity of its advocacy. But under Seventh Circuit precedent, The Bail Project's regulated conduct is not inherently expressive, so The Bail Project has not shown a likelihood of success on this First Amendment claim.

### B. Fourteenth Amendment Equal Protection

The Bail Project argues that HEA 1300 violates the Equal Protection Clause because it treats charitable bail organizations differently than anyone else who might pay bail, without a rational reason for doing so. Dkt. 26 at 22–23. The Commissioner responds that HEA 1300 survives rational-basis review because it's related to the legitimate government interest of "regulating major actors in the bail industry differently based upon their distinct responsibilities and accountability in the criminal justice system." Dkt. 29 at 22.

Rational-basis review, which the parties agree applies here, is "the most lenient form of judicial review." *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017). "This deferential standard of review is a notoriously heavy legal lift for the challenger." *Id.* To succeed, "the challenger must negate every

15

conceivable basis that might support the challenged law, and it is entirely irrelevant whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.*

The Indiana General Assembly undoubtedly has an interest in regulating pretrial release of defendants in criminal cases. *See DeWees*, 180 N.E.3d at 268 (explaining Indiana's comprehensive statutory framework). The Bail Project thus has not shown a likelihood of success on its claim that Indiana has no interest in regulating charitable bail organizations. The Bail Project argues that Indiana cannot rationally do so because it doesn't also regulate, for example, churches or individuals with the financial means to pay cash bail for others. Dkt. 32 at 11. But that doesn't make it necessarily irrational to regulate entities that "exist[ ] for the purpose of depositing cash bail." Ind. Code § 27-10-2-4.5(b). The General Assembly could reasonably think that organizations with such a purpose—"major actors in the bail industry," as the Commissioner describes them—are likely to have policy preferences different than its own. *See* dkt. 29 at 23. And it could reasonably be concerned that, without regulation, charitable bail organizations wouldn't have the financial accountability and incentives that the statutory scheme otherwise assumed were present. *Id.* That's enough to survive rational-basis review here. *See Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020) ("[R]ational-basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").

S.A. 16

**C. Remaining First Amendment Challenges**

The Bail Project also argues that HEA 1300 violates the First Amendment because it gives the Commissioner "unfettered discretion" whether to certify it as a charitable bail organization.  Dkt. 26 at 14–16.  It adds in a footnote that the certification standards are unconstitutionally vague because they don't provide enough clarity to avoid discriminatory enforcement.  *Id.* at 16 n.8.  The Commissioner responds that The Bail Project has not been through the certification process, which is still being developed by the Department of Insurance.  Dkt. 29 at 11.  In reply, The Bail Project argues that the Commissioner waived any argument by failing to respond to its footnote that mentioned vagueness concerns.  Dkt. 32 at 4.

The Court need not decide whether the Commissioner waived any argument about vagueness concerns because the burden at this stage remains on The Bail Project to show why a preliminary injunction is appropriate.  *See Cassell*, 990 F.3d at 544.  It has not done so.

The Bail Project's argument that the Commissioner retains too much discretion relies on its argument that the act of paying cash bail is inherently expressive conduct.  *See* dkt. 26 at 15 (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 (1988)).[6]  Indeed, it clarifies that it is not

---

[6] The Bail Project also assumes that it will be subject to "the judgment of the commissioner" in its initial certification, dkt. 26 at 15 n.6, even though the statutory section at issue allows the Commissioner to deny certification based on an organization's "conduct of affairs under the certification."  Ind. Code § 27-10-2-4.5(f).  The Commissioner has not said that it will interpret the statute to apply to an initial application.  *See* dkt. 29.

17

questioning the "similar if not identical" standards governing bail-bond agents, because bail-bond agents "are not exercising their First Amendment rights when they pay bail." Dkt. 26 at 16 n.7. For the reasons explained above, The Bail Project has not shown a likelihood of success justifying a preliminary injunction on the underlying First Amendment claims. Since this claim relies on those arguments, it also cannot support a preliminary injunction.

The Bail Project's vagueness challenge similarly invokes the underlying First Amendment claims. Dkt. 26 at 16 n.8 (citing *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012)). Since The Bail Project has not shown that its vagueness challenge implicates the First Amendment, HEA 1300 "is analyzed as applied to the specific facts of the case." *United States v. Nagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017). But the Commissioner has not yet promulgated rules governing the certification process, The Bail Project has not yet applied to be certified, and this argument—raised only in a footnote—does not analyze HEA 1300's potential application to The Bail Project's eventual application for certification. The Bail Project therefore has not shown a likelihood of success on this claim.

18

S.A. 18

**IV.**
**Conclusion**

Because The Bail Project has not shown a likelihood of success on the

merits to justify a preliminary injunction, the motion for preliminary injunction

is **DENIED**.  Dkt. [6].[7]

**SO ORDERED.**

Date: 6/29/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Lydia Ann Golten
INDIANA ATTORNEY GENERAL
lydia.golten@atg.in.gov

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

---

[7] Because The Bail Project has not shown a likelihood of success on the merits
justifying a preliminary injunction, the Court does not consider the other preliminary
injunction factors.  *See Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998).

S.A. 19

Caryn Nieman Szyper
INDIANA ATTORNEY GENERAL
caryn.szyper@atg.in.gov

S.A. 20

**STATEMENT OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) are included within the appendix. There are no materials within the scope of Circuit Rule 30(b).

/s/ *Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law