No. 22-2183

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

THE BAIL PROJECT, INC.,
*Plaintiff-Appellant*,

v.

COMMISSIONER,
INDIANA DEPARTMENT OF INSURANCE,
*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division,
No. 1:22-cv-862-JPH-MJD,
The Honorable James P. Hanlon, Judge.

_____

**BRIEF OF APPELLEE**

_____

AARON T. CRAFT
Section Chief, Civil Appeals

OFFICE OF THE ATTORNEY GENERAL
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-4774
Aaron.Craft@atg.in.gov

*Counsel for Defendant-Appellee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................ii

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION..................................................................................... 1

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE .................................................................. 3

    A. Indiana's bail system allows for cash bail or bail bonds........................ 3

    B. The Department of Insurance has long regulated the bail industry .... 6

    C. Until recently, The Bail Project ran its social experiment in Indiana without any regulatory oversight............................................................. 8

    D. The General Assembly enacted HEA 1300 to subject charitable bail organizations to some measure of regulatory oversight....................... 12

    E. The district court denied a preliminary injunction, concluding that The Bail Project failed to demonstrate a likelihood of success on the merits.......................................................................................... 15

SUMMARY OF THE ARGUMENT........................................................ 17

ARGUMENT .......................................................................................... 20

    I. HEA 1300 Does Not Implicate, Let Alone Violate, the First Amendment Because the Payment of Bail Is Not Inherently Expressive Conduct ........................................................................ 21

        A. Paying bail in the county clerk's office is not inherently expressive conduct protected by the First Amendment........................ 22

        B. Because the payment of cash bail does not implicate the First Amendment, The Bail Project's facial vagueness challenge fails........ 29

        C. Even if the payment of bail implicated the First Amendment, HEA 1300 would be subject to and survive intermediate scrutiny under *O'Brien*.......................................................................... 30

II. HEA 1300 Does Not Violate the Equal Protection Clause Because the Legislature Reasonably Believed that Charitable Bail Organizations Lack the Incentives and Deterrent Effects Possessed by Family, Friends, and Bail Agents ............................................................ 35

CONCLUSION ................................................................................. 40

FED. R. APP. P. 32(g) WORD COUNT CERTIFICATE ....................................... 41

# TABLE OF AUTHORITIES

## CASES

*Armour v. City of Indianapolis*, 566 U.S. 673 (2012) ................................................... 35

*Braam v. Carr*, 37 F.4th 1269 (7th Cir. 2022) ............................................................. 1

*Brazil-Breashears v. Bilandic*, 53 F.3d 789 (7th Cir. 1995) ........................................ 36

*Brown v. Louisiana*, 383 U.S. 131 (1966) .................................................................... 25

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021) ........................... 24, 27

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) ................................................. 20, 31

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) ...................... 15

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) .................................. 35

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) ........................................................... 21

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) .................... 30

*Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*,
     559 F.3d 595 (7th Cir. 2009) ............................................................................. 23, 28

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) .................. 22, 25

*Dandridge v. Williams*, 397 U.S. 471 (1970) .............................................................. 39

*DeWees v. State*, 180 N.E.3d 261 (Ind. 2022) .............................................................. 3

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993) .......................................... 35

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........................................ 30

*Fort Lauder-dale Food Not Bombs v. City of Fort Lauderdale*,
     901 F.3d 1235 (11th Cir. 2018) ....................................................................... 24, 28

*Heller v. Doe*, 509 U.S. 312 (1993) .............................................................................. 35

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
     515 U.S. 557 (1995) .............................................................................................. 25

*O'Laughlin v. Barton*, 549 N.E.2d 1040 (Ind. 1990) .................................................... 4

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) .............. 35

CASES [CONT'D]

*Plyler v. Doe*, 457 U.S. 202 (1982) ....................................................... 35

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ..............................................................*passim*

*Spence v. Washington*, 418 U.S. 405 (1974) ...................................... 24

*Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017) ...................*passim*

*Texas v. Johnson*, 491 U.S. 397 (1989) ......................................22, 24, 28, 31

*Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503 (1969) ................. 25

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009) ... 20

*United States v. Naagelvoort*, 856 F.3d 1117 (7th Cir. 2017)....................................... 30

*United States v. O'Brien*, 391 U.S. 367 (1968) ......................................*passim*

*United States v. Salerno*, 481 U.S. 739 (1987) ...................................... 32

*Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955) ...................... 36, 39

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)....................................... 20

STATUTES

28 U.S.C. § 1292(a)(1) ....................................................................... 1

28 U.S.C. § 1331 ................................................................................. 1

28 U.S.C. § 1343 ................................................................................. 1

42 U.S.C. § 1983 ................................................................................. 1

Ind. Code art. 27-10............................................................................. 6

Ind. Code § 27-10-1-4 ......................................................................... 5

Ind. Code § 27-10-1-6 ......................................................................... 7

Ind. Code § 27-10-1-9 ......................................................................... 6

Ind. Code § 27-10-1-10 ....................................................................... 5

Ind. Code § 27-10-2-4 ......................................................................5, 10

STATUTES [CONT'D]

Ind. Code § 27-10-2-4.5 ................................................................... 12

Ind. Code § 27-10-2-4.5(a) .............................................................. 13

Ind. Code § 27-10-2-4.5(a)(1) .................................................... 36, 39

Ind. Code § 27-10-2-4.5(d) .............................................................. 13

Ind. Code § 27-10-2-4.5(f) ............................................................... 14

Ind. Code § 27-10-2-4.5(g)(1) .......................................................... 34

Ind. Code § 27-10-2-4.5(g)(2) ...........................................2, 13, 34, 36

Ind. Code § 27-10-2-4.5(g)(3) .......................................................... 13

Ind. Code § 27-10-2-4.5(g)(4) .......................................................... 13

Ind. Code § 27-10-2-4.5(j) ............................................................... 13

Ind. Code § 27-10-2-4.6(1) .............................................................. 14

Ind. Code § 27-10-2-5 ...................................................................... 14

Ind. Code § 27-10-2-6 .................................................................. 5, 14

Ind. Code § 27-10-2-7 ...................................................................... 14

Ind. Code § 27-10-2-8 ........................................................................ 5

Ind. Code § 27-10-2-12 ................................................................. 6, 10

Ind. Code § 27-10-2-12(c) ................................................................ 10

Ind. Code § 27-10-2-14 ...................................................................... 6

Ind. Code § 27-10-2-16 ...................................................................... 5

Ind. Code § 27-10-3-1 ........................................................................ 6

Ind. Code § 27-10-3-2 .................................................................. 7, 39

Ind. Code § 27-10-3-3 .................................................................. 6, 7

Ind. Code § 27-10-3-4 ........................................................................ 6

STATUTES [CONT'D]

Ind. Code § 27-10-3-5 ................................................................... 6

Ind. Code § 27-10-3-6 ................................................................... 6

Ind. Code § 27-10-3-7 .............................................................. 7, 39

Ind. Code § 27-10-3-8 .............................................................. 8, 39

Ind. Code § 27-10-3-9 .............................................................. 7, 39

Ind. Code § 27-10-3-10 ........................................................... 7, 39

Ind. Code § 27-10-3-11 ................................................................. 6

Ind. Code § 27-10-3-14 ........................................................... 5, 7

Ind. Code § 27-10-4-2 ................................................................... 7

Ind. Code § 27-10-4-3 ................................................................... 7

Ind. Code § 27-10-4-5 ................................................................... 7

Ind. Code § 27-10-4-6 ................................................................... 7

Ind. Code § 33-24-6-3(a)(7) ....................................................... 13

Ind. Code § 35-33-8-3.2 ................................................................ 5

Ind. Code § 35-33-8-3.2(a) ........................................................... 4

Ind. Code § 35-33-8-3.2(b) ........................................................... 4

Ind. Code § 35-33-8-3.8 ................................................................ 4

Ind. Code § 35-33-8-3.9 ................................................................ 5

Ind. Code § 35-33-8-3.9(a) ........................................................... 4

Ind. Code § 35-33-8-4(b) .............................................................. 4

Ind. Code § 35-33-8-7 ................................................................... 4

Ind. Code § 35-50-1-2(a) ................................................... 9, 13, 36

Ind. Code § 35-50-2-4 ................................................................. 36

STATUTES [CONT'D]

Ind. Code § 35-50-2-4.5 ................................................................ 36

Ind. Code § 35-50-2-5 ................................................................... 36

Ind. Code § 35-50-2-5.5 ................................................................ 36

Ind. Code § 35-50-2-6 ................................................................... 36

Ind. Code § 35-50-2-7 ................................................................... 36

Pub. L. No. 261-1985, 1985 Ind. Acts 2028 ................................. 6

Pub. L. No. 224-1993, 1993 Ind. Acts 4345 ................................. 3

Pub. L. No. 147-2022, 2022 Ind. Acts 1854 ............................... 12

OTHER AUTHORITIES

760 Ind. Admin. Code 1-6.2-10 .................................................... 5

760 Ind. Admin. Code 1-6.2-7 ...................................................... 7

Courtney Crown, *Another Person Charged with Murder After Bail Project Pays Bail for Previous Charges*, Fox59.com (Oct. 21, 2021), https://fox59.com/news /indycrime/indianapolis-man-bailed-out-of-jail-by-bail-project-now-facing-mur-der-charges/ ................................................................................ 33

Ind. Crim. R. 26 ............................................................................ 4

Ind. Reg. LSA Doc. No. 22-228 (June 30, 2022), *available at* http://iac.iga.in.gov/iac/irtoc.htm ..................................... 14

Nikki Sterling, *Op-Ed: The Bail Project Can Bail Out Anyone, Regardless of the Charge. That Should End.*, IndyStar (Jan. 5, 2022), https://www.indystar.com/ story/opinion/2022/01/05/bail-project-needs-regulation-indiana-son-mur-der-out-bail/9087566002/. .......................................................... 33

The Bail Project, Our Approach, https://bailproject.org/our-work/ .............................. 8

## JURISDICTIONAL STATEMENT

The appellant's jurisdictional statement is not complete and correct. The Bail Project brought this official-capacity suit under 42 U.S.C. § 1983 against the Commissioner of the Indiana Department of Insurance seeking declaratory relief and an injunction forbidding the Commissioner from enforcing Indiana House Enrolled Act 1300, which subjects charitable bail organizations to regulation by the Department of Insurance. R.1. The Bail Project alleged that HEA 1300 violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. R.1 at 14–15. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because The Bail Project alleged violations of its federal constitutional rights.

On June 29, 2022, the district court denied The Bail Project's motion for a preliminary injunction against HEA 1300's enforcement. S.A.1–20. The Bail Project timely filed its notice of appeal on July 6, 2022. R.38.

This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1) because it is an appeal from an order denying The Bail Project's motion for a preliminary injunction. *See, e.g.*, *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022).

## INTRODUCTION

Social experiments can have untoward consequences. For several years, The Bail Project, a national nonprofit advocacy group based chiefly in California, has run a social experiment in Indiana without any regulatory oversight. It uses crowdsourced funds to pay cash bail for criminal defendants based on its own secretive eligibility criteria. Unlike family members who post cash bail, licensed bail

agents who post bond, and Hoosiers who live in the communities into which criminal defendants are released when their bail is paid, the only risk The Bail Project incurs when it pays cash bail and the defendant fails to show up or commits more violent crime is the loss of other people's money.

After a few publicized instances in which defendants bailed out by The Bail Project committed serious crimes, the courts that embraced The Bail Project cooled their endorsement, and the Indiana General Assembly passed House Enrolled Act 1300 to provide regulatory oversight by the state agency that has long regulated the non-charitable bail-bond industry. Among other things, HEA 1300 forbids a charitable bail organization from paying cash bail for a defendant charged with a felony who has a prior conviction for a statutorily defined crime of violence or has been charged with a crime of violence. Ind. Code § 27-10-2-4.5(g)(2).

Believing that the Constitution entitles it to run its social experiment free from regulation, The Bail Project brought this suit to enjoin the Commissioner of the Department of Insurance from enforcing HEA 1300. In The Bail Project's view, HEA 1300 violates the First Amendment because it restricts for whom it may pay bail and confers too much regulatory discretion on the Commissioner, and it violates the Equal Protection Clause because others (e.g., friends and family) are not subject to similar restrictions.

The district court denied The Bail Project's motion for a preliminary injunction against enforcement of HEA 1300. The court correctly concluded that the payment of cash bail is not inherently expressive conduct and thus the Act does not implicate the

First Amendment. And it also correctly concluded that the Act does not violate the Equal Protection Clause because the legislature could reasonably conclude that charitable bail organizations lack the financial and other incentives that others—e.g., family and friends—have when posting cash bail.

## STATEMENT OF THE ISSUES

I.     Whether the district court correctly determined that The Bail Project is unlikely to succeed on its free-speech and vagueness challenges to HEA 1300 because the payment of bail is not inherently expressive conduct shielded by the First Amendment.

II.     Whether the district court correctly determined that The Bail Project is unlikely to succeed on its equal-protection challenge to HEA 1300 because there is a rational basis for the State's regulations on charity bail operations.

## STATEMENT OF THE CASE

### A.     Indiana's bail system allows for cash bail or bail bonds

When a person is arrested and charged with a crime in Indiana, an Indiana trial court must determine whether to release the person pending trial or to set bail (or, in rare cases, remand the defendant to custody with no bail). State law "strongly encourages pretrial release," so "if a defendant presents no 'substantial risk of flight or danger' to others, the [state] court must consider releasing the defendant without money bail or surety." *DeWees v. State*, 180 N.E.3d 261, 268 (Ind. 2022). But if the trial court determines that the defendant is a flight risk or poses a danger to another person or the public, the court may set bail. *Id.* at 267–68.

To determine the amount of bail for a particular defendant, a court conducts an individualized assessment guided by the requirements established by state statute and court rule. Ind. Code §§ 35-33-8-3.8, 35-33-8-4(b); Ind. Crim. R. 26. The court may set bail at an "amount reasonably required to assure the defendant's appearance in court or to assure the physical safety of another person or the community." Ind. Code § 35-33-8-4(b). And it may impose restrictions or other conditions on the defendant. Ind. Code § 35-33-8-3.2(a). The court may also order the defendant or anyone who pays bail on behalf of the defendant to execute an agreement that allows the court to retain all or part of the cash to cover any post-conviction fines, costs, fees, and restitution. Ind. Code § 35-33-8-3.2(a). In addition to determining the amount, the court determines whether bail must be paid in cash or bond. Ind. Code §§ 35-33-8-3.2(a), 35-33-8-3.9(a).

*Cash Bail*: Cash bail is relatively straightforward. It requires full payment of the court-established bail amount. R.25-1 at 11–12. Generally, "anyone can post cash bail" for a defendant by delivering the cash to the county clerk's office of the court where the criminal case is pending. R.25-1 at 9, 12, 18. If the defendant appears at all court proceedings, the cash bail will be released at the conclusion of the case. Ind. Code § 35-33-8-3.2(b). But if the defendant fails to appear as required, the cash bail may be forfeited. Ind. Code § 35-33-8-7; *O'Laughlin v. Barton*, 549 N.E.2d 1040, 1042 (Ind. 1990).

*Bail Bonds*: Bail bonds, on the other hand, are effectively insurance arrangements. In general, a bail bond—posted by a licensed bail agent in exchange for a fee

4

(usually 10 percent of the bail amount)—serves as a guarantee (i.e., a surety bond) that the defendant will appear for trial. Ind. Code §§ 27-10-2-16, 35-33-8-3.9, 35-33-8-3.2; 760 I.A.C. 1-6.2-10 (requirements for the contract between principal and surety); R.25-1 at 11–12; R.28-3 at 4. A bail agent is a person "appointed by an insurer … to execute or countersign bail bonds for the insurer in connection with judicial proceedings for which the person receives a premium." Ind. Code § 27-10-1-4. And a surety means "any person who satisfies [certain] qualifications … and who agrees to pay the bond in the event the defendant fails to appear in court at the scheduled date and time." Ind. Code § 27-10-1-10; *see* Ind. Code § 27-10-2-4 (requiring that a "surety" either "(1) be a qualifying insurer and represented by a bail agent or (2) be an adult resident of Indiana who is related within the third degree of affinity to the person for whom release on bail is sought and who owns certain property"). If the surety posts bail, the court is required to notify the bail agent or insurer at least 72 hours before the defendant's appearance is required, and if the defendant fails to appear it is a breach of the undertaking. Ind. Code § 27-10-2-8.

When a defendant fails to appear, the court issues an arrest warrant and orders the bail agent and surety to surrender the defendant to the court immediately. Ind. Code § 27-10-2-6. To assist in apprehending defendants, bail agents and sureties may use a licensed recovery agent, Ind. Code § 27-10-3-14, which is "a person who is offered or given any compensation … in exchange for assisting the bail agent or surety in apprehending or surrendering any defendant or keeping a defendant under neces-

sary surveillance," Ind. Code § 27-10-1-9. *See also* R.25-1 at 10–11 (noting that recovery agents are sometimes colloquially referred to as "bounty hunters"). A bail agent or surety who fails to produce a defendant faces a late surrender fee of up to 80% of the face value of the bond in escalating increments unless certain enumerated exceptions apply. *See* Ind. Code §§ 27-10-2-12, 27-10-2-14.

**B.    The Department of Insurance has long regulated the bail industry**

The Department of Insurance does not play a role in state trial courts' bail determinations. The Department's overall mission, rather, is to protect Hoosiers as they purchase and use insurance products to keep their assets and their families protected from loss or harm. R.28-3 at 1. Given that mission and given that the bail-bond industry provides security bonds backed by insurance companies that cover risk, the Indiana General Assembly has long charged the Commissioner of the Department of Insurance with regulatory oversight of the major actors in the bail system—bail agents, recovery agents, and sureties. Pub. L. No. 261-1985, 1985 Ind. Acts 2028 (codified as amended at Ind. Code art. 27-10); *see also* Pub. L. No. 224-1993, 1993 Ind. Acts 4345.

Individuals who wish to serve as bail agents or recovery agents must be licensed by the Department. Ind. Code § 27-10-3-1. Aspiring agents must complete training, pass a licensing exam, and pay a fee with their application. Ind. Code §§ 27-10-3-3 (applications and qualifications), 27-10-3-4 (exam, fingerprints, and photographs), 27-10-3-5 (recovery agent licensing), 27-10-3-6 (examination). Bail-agent applicants must be appointed by an insurer, Ind. Code § 27-10-3-11, and recovery-agent

applicants must be sponsored by a licensed bail agent, Ind. Code § 27-10-3-14. R.28-3 at 2–3. And applicants must not have been convicted of a felony conviction or a misdemeanor involving dishonesty, violence, or a deadly weapon, unless a specified time has passed. Ind. Code §§ 27-10-3-3, 27-10-1-6; R.28-3 at 2–3. Bail agents and recovery agents must also renew their licenses every two years, which requires completion of six hours of continuing education. Ind. Code §§ 27-10-3-2, 27-10-3-7; R.28-3 at 3.

Indiana law prohibits bail agents and recovery agents from engaging in certain activities, many of which are criminal offenses. For example, a bail agent commits a Level 6 felony by knowingly or intentionally executing a bail bond without collecting the full premium, at the rate approved by the Commissioner. Ind. Code § 27-10-4-5; R. 28-3 at 3–4; *see also* Ind. Code §§ 27-10-4-2, 27-10-4-6 (listing other offenses); 760 I.A.C. 1-6.2-7 (prohibiting gifts to public officials or prisoners). The law further prohibits certain persons involved in the criminal justice system from serving as bail agents or receiving any benefit from the execution of bond, including jailers, law enforcement officers, judges, and those involved in controlling prisoners. Ind. Code § 27-10-4-3; R.28-3 at 3–4.

To enforce the license requirements, the Commissioner is authorized to discipline, deny, or revoke bail agents' and recovery agents' licenses for a variety of reasons. Ind. Code §§ 27-10-3-9, -10; R.28-3 at 5–6. For example, the Commissioner may take action if a licensee fails to pay late-surrender judgments; is convicted of a dis-

qualifying offense; makes material misstatements; engages in fraudulent or dishonest practices; and when, in the judgment of the Commissioner, the licensee has, "in the conduct of the affairs under the license," demonstrated incompetency or untrustworthiness or engaged in "conduct or practices rendering the licensee unfit to carry on the bail bond business," among other things. Ind. Code § 27-10-3-8.

## C. Until recently, The Bail Project ran its social experiment in Indiana without any regulatory oversight

The Bail Project is a national advocacy organization that aims to disrupt the cash-bail system across the United States. R.24-4 at 1. It solicits donations on its website for what it calls a "national revolving bail fund," which is a crowdsourced fortune comprised of millions in contributions from "nearly 500,000 individuals, companies, and foundations." The Bail Project, Our Approach, https://bailproject.org/our-work/; R.28-4 at 2–3. It then uses the crowdsourced money to pay cash bail for defendants charged with a variety of crimes in 20 States, including Indiana. *Ibid.* And after a criminal case is resolved and bail money is returned, The Bail Project applies it to the next criminal defendant who meets its own "eligibility criteria" for free bail. R.28-4 at 2–3. The organization advocates that its mission will "create a more just, equitable, and humane pretrial system." The Bail Project, About Us, *supra*; R.28-4 at 1–3.

The Bail Project is secretive as to whom it selects for its crowdsourced largesse, but it admits that it bails out not only defendants charged with relatively minor crimes but also those charged with severe crimes. R.28-1 at 10. The organization's

staff decides who is eligible based on a "highly individualized" process; the organization, however, has not shared what criteria it uses, other than to say that it prefers "to use bail amount as a better proxy for severity." R.28-1 at 14; R.28-4 at 4; R.28-5 at 7.

Since it began operating in Indiana in 2018 (in Marion County and Lake County only), The Bail Project has paid more than $2.6 million in cash bail for more than a thousand criminal defendants, some of whom were charged with crimes of violence, had a violent criminal history, or both. R.28-1 at 2; R.28-4 at 4–6; *see* Ind. Code § 35-50-1-2(a) ("crime of violence" means offenses such as attempted murder, manslaughter, reckless homicide, battery, kidnapping, child molesting, and possession of a firearm by a serious violent felon, among others). While many of the 980 defendants bailed out by The Bail Project between December 2018 and December 2021 were charged with misdemeanors and low-level felonies, hundreds of those defendants had either been charged with a crime of violence (232, or 24%) or had been charged with a felony and had a previous charge of at least one crime of violence (346, or 35%). R.28-1 at 10-12; *see also* R.28-12 at 5-6, 14, 27 (examples of The Bail Project's 2022 clients charged with drug dealing and possession of a firearm by a serious violent felon).

Once it decides to bail out a particular defendant, The Bail Project pays the bail amount in-person at the local court clerk's office. R.28-1 at 12–13. A Bail Project employee—called a "bail disruptor"—enters the county clerk's office and makes bail payments with a cashier's check from the organization's account. R.28-1 at 2–3, 12–

13. In Marion County, the staff person must also complete a bond form, which includes the defendant's name, cause number, date, and the employee's name. R.28-1 at 12. And in Lake County, The Bail Project employee signs a ledger that remains in the court clerk's office. R.28-1 at 13.

Once The Bail Project has secured a defendant's release, it offers certain services, but it does not have any recourse if a defendant fails to appear. It provides court reminders, arranges transportation, offers some defendants cell phones, and tracks upcoming appearance outcomes and court dates. R. 28-1 at 6. When a defendant fails to appear for trial, The Bail Project attempts to call, text, or email the defendant. It, however, does not (and legally cannot) apprehend or surrender the defendant to the court. R.28-1 at 8. The Bail Project is also not assessed escalating late-surrender fees or actual costs associated with a defendant's failure to appear. *Cf.* Ind. Code § 27-10-2-12(c) (late-surrender fees assessed on bail agent or surety). In other words, unlike licensed bail agents and sureties, The Bail Project has no statutory responsibility or mechanism to return an unwilling defendant to authorities, and it faces fewer consequences. *Compare* Ind. Code § 27-10-2-4, *with* Ind. Code § 27-10-2-12. The organization stands to forfeit only its crowdsourced funds.

Some Indiana courts initially embraced The Bail Project. In both Marion and Lake Counties, the courts had exempted The Bail Project's cash payments from deductions of "any costs imposed by the court (including but not limited to fines, fees, restitution and the maintenance fee) unless the bond is subject to forfeiture for a failure to appear," unlike cash deposits posted by defendants, their families, and bail

agents. R.28-8; *accord* R.28-6; R.28-11 at 2-3. But after several news stories alleging that defendants bailed out by The Bail Project had committed murder and other serious offenses while out on bail, and after The Bail Project failed to provide timely quarterly reports to the courts, the Marion County judges suspended support and requested information about the national organization's work in the local community. R.28-5; R.28-7. The Marion County judges requested a list of all cases in which The Bail Project had posted bail and asked that the list include the defendants' names and case numbers, identify whether those it had bailed out had either a pretrial-release violation or were arrested for new charges, and identify any referral services made by The Bail Project. *Ibid.*

The Bail Project responded with a report of the organization's statistical analysis of its operations. R.28-5. The report does not identify the individual bail payments made by the organization, other than the cases where The Bail Project's clients had been rearrested for murder and other violent charges that had led to some of the organization's negative press coverage. R.28-5 at 15–20. Instead, The Bail Project privately sent each judge a password-protected, forensically tracked web portal where the judges could access the specific lists and "the raw data upon which this report was generated" but not download the information. R.28-5 at 1, 4-5. The Bail Project's quarterly reports to the Lake County officials similarly rest on statistics and do not include specific instances, and it considers even the statistical reports on its work "confidential." R.28-9 at 1–5. The Bail Project similarly refuses to reveal its source of funds. R.28-2 at 3–4.

In defense of its mission, The Bail Project's report compared the organization's work with the bail industry. The Bail Project recognizes—as it must—that it is operating in a "difficult and risky system," and it admits that "it was a statistical certainty that eventually some cases would not turn out perfectly." R.28-5 at 1, 4. Yet it claims that its failure-to-appear rates and re-arrest rates are better than the rates of the bail-bond industry. *See, e.g.*, R.28-5 at 4 ("These numbers represent a significant advantage over rearrests rates for whom the commercial bail bond industry stands surety."). The Bail Project concedes "that 'high risk' and 'medium risk' individuals in Indiana appear far less frequently—at 47.5% and 67% respectively"—than those assessed as "low risk" to reoffend. R.28-11 at 1. It asserts, however, that the defendants it bails out have a better appearance rate than the predicted appearance-rate percentages—but a percentage of them nonetheless fail to appear. *Id.*

## D.   The General Assembly enacted HEA 1300 to subject charitable bail organizations to some measure of regulatory oversight

During the 2022 legislative session, the General Assembly passed, and the Governor signed, HEA 1300, which became effective July 1, 2022. Pub. L. No. 147-2022, § 2, 2022 Ind. Acts 1854, 1854–57 (codified at Ind. Code § 27-10-2-4.5). The law subjects charitable bail organizations to regulatory oversight by the Department of Insurance, similar (but not identical) to the Department's regulatory oversight of the bail-bond industry. Like the licensure of bail agents and recovery agents, HEA 1300 requires a charitable bail organization, defined as "a business entity or nonprofit that exists for the purpose of paying cash bail for another person," to obtain certification

by the Department of Insurance. Ind. Code § 27-10-2-4.5(a). To qualify, the organization must pay a $300 application fee and may not have an officer or director who has engaged in certain conduct, including fraud, malfeasance in dealing with money, or prior conduct that resulted in a suspension or revocation of a previous certification to operate as a charitable bail organization. Ind. Code § 27-10-2-4.5(d).

A certified charitable bail organization is subject to certain limits and requirements. Most importantly for this case, HEA 1300 forbids a charitable bail organization from posting cash bail for a defendant who is charged with a "crime of violence" or a defendant charged with a felony who also has a prior conviction for a "crime of violence."[1] Ind. Code § 27-10-2-4.5(g)(2). A charitable bail organization also may not post a surety bond for a defendant. Ind. Code § 27-10-2-4.5(g)(3). And before posting cash bail, a charitable bail organization must execute an agreement allowing the court to retain all or a part of the bail to pay publicly paid costs of representation and fines, costs, fees, and restitution that the court may order the defendant to pay if the defendant is convicted. Ind. Code § 27-10-2-4.5(g)(4). The Act requires the clerk of the court to record certain information identifying the person or agent posting bail and make it available on the court's electronic case-management system (known as My-Case). Ind. Code § 33-24-6-3(a)(7). And if a defendant fails to appear, the bail is forfeited. Ind. Code § 27-10-2-4.5(j).

---

[1] The term "crime of violence" includes 21 offenses, such as murder, attempted murder, voluntary and involuntary manslaughter, reckless homicide, certain forms of battery, kidnapping, rape, child molesting, certain robbery and burglary offenses, and unlawful possession of a firearm by a serious violent felon, among others. Ind. Code § 35-50-1-2(a).

HEA 1300 does not, however, subject charitable bail organizations to all the regulations applicable to bail agents and sureties. For instance, it does not require charitable bail organizations' employees to pass an examination or take a 12-hour Department-approved course. Nor does it require a charitable bail organization to apprehend and surrender a defendant if the defendant it bailed out failed to appear. And HEA 1300 also does not subject charitable bail organizations to late-surrender fees when defendants fail to appear after a certain period of time has passed. *Cf.* Ind. Code §§ 27-10-2-5, 27-10-2-6, 27-10-2-7.

To enforce the new law, HEA 1300 empowers the Commissioner to discipline, deny, or revoke a charitable bail organization's certification for the same reasons the Commissioner is authorized to discipline, deny, or revoke a bail agent's or recovery agent's license. In a statutory provision identical to the one applicable to the bail-bond industry, the Commissioner may take action if, among other things, a certificate holder has violated state law; has made material misstatements; has engaged in fraudulent or dishonest practices; has engaged in misappropriation; and when, in the judgment of the Commissioner, the certificate holder has, "in the conduct of the affairs under the license," demonstrated incompetency or untrustworthiness, engaged in "conduct or practices rendering the licensee unfit to carry on as a charitable bail organization." Ind. Code § 27-10-2-4.5(f).[2]

---

[2] In accordance with the Act, Ind. Code § 27-10-2-4.6(1), the Commissioner promulgated an emergency rule to implement HEA 1300. Ind. Reg. LSA Doc. No. 22-228 (June 30, 2022), *available at* http://iac.iga.in.gov/iac/irtoc.htm.

**E.      The district court denied a preliminary injunction, concluding that The Bail Project failed to demonstrate a likelihood of success on the merits**

Dissatisfied that its social experiment is now subject to regulation, The Bail Project sued to enjoin the Commissioner of the Department of Insurance from enforcing HEA 1300. R.1. The Bail Project alleged that the Act violates its free speech rights by limiting the defendants for whom it may post cash bail and by conferring too much discretion on the Commissioner to deny, revoke, or discipline a charitable bail organization's certification. R.1 at 2, 12-15. It also alleged that the Act violates the Equal Protection Clause because others (e.g., bail agents, criminal defendants and their families) are allowed to pay cash bail irrespective of the charges. R.1 at 2, 15. The Bail Project sought a declaration that HEA 1300 is unconstitutional and injunctive relief to halt any oversight of the national crowdsourced entity operating in Indiana's local communities. R.1 at 15. It also moved for a preliminary injunction. R.6.

The district court denied The Bail Project's request for preliminary injunctive relief because The Bail Project could not establish a likelihood of success on the merits. S.A.1–20. First, the court rejected The Bail Project's argument "that the payment of cash bail … is 'pure speech'" under campaign-finance cases like *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), because paying cash bail is not "directly attached to speech" and The Bail Project had not "explained how it could implicate speech or public debate in a similar way." S.A.9–10.[3]

---

[3] The Bail Project has abandoned its "pure speech" argument and its reliance on campaign-finance cases on appeal, arguing instead only that its payment of bail is inherently expressive conduct entitled to First Amendment protection. *See* Appellant's Br. 23–30.

Second, the court concluded that paying cash bail is not inherently expressive conduct protected by the First Amendment because "The Bail Project's intended message—that the cash bail *system* is unnecessary—requires the communication of additional, more comprehensive information." S.A.13. In other words, the expressive significance of The Bail Project's payment of bail arises only because of their subsequent speech about the conduct, which, the district court acknowledged, is "strong evidence that the conduct here is not … inherently expressive." S.A.13 (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)). Because paying bail is not inherently expressive, the court concluded, "the First Amendment is not implicated." S.A.13. But even if it were, the court continued, HEA 1300 survives scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), because The Bail Project had not "explained why Indiana doesn't have an interest in ensuring that charitable bail organizations consider the severity of the charged conduct or prior convictions," S.A.14–15.

Third, the court rejected The Bail Project's equal-protection challenge to HEA 1300. S.A.15–16. Applying rational-basis scrutiny, the court concluded that regulation of charitable bail organizations, but not other charities who *could* post cash bail, was rational because "[t]he General Assembly could reasonably think that organizations [that exist for the purpose of paying cash bail] … are likely to have policy preferences different than its own." S.A.16. And the General Assembly also "could reasonably be concerned that, without regulation, charitable bail organizations wouldn't

have the financial accountability and incentives that the statutory scheme otherwise assumed were present." S.A.16.

And fourth, the court concluded that The Bail Project had not shown a likelihood of success on the merits of its "unfettered discretion" or vagueness challenges. S.A.17–18.  Because The Bail Project's payment of cash bail is not inherently expressive and does not trigger First Amendment scrutiny, The Bail Project's vagueness claim similarly failed. S.A.18.  Absent First Amendment implications, The Bail Project's vagueness challenge had to be analyzed on the specific facts of the case, yet "the Commissioner ha[d] not yet promulgated rules governing its certification process, The Bail Project ha[d] not yet applied to be certified, and this argument—raised only in a footnote—does not analyze HEA 1300's potential application to The Bail Project's eventual application for certification." S.A.18.

Because The Bail Project could not establish a likelihood of success on the merits, the district court did "not consider the other preliminary injunction factors." S.A.19 n.7 (citation omitted).

## SUMMARY OF THE ARGUMENT

The district court correctly determined that The Bail Project is not entitled to a preliminary injunction because it cannot establish a likelihood of success on the merits of any of its claims.

I. The Bail Project's claims under the First Amendment fail because the act of paying bail is not inherently expressive. But for The Bail Project's explanatory speech

conveying the significance of its act of paying bail, no reasonable observer who witnessed an employee of The Bail Project pay bail in the county clerk's office would view that conduct as expressing a message. Rather, a reasonable observer would view the financial transaction merely as a means to secure a criminal defendant's release from jail pending trial. Because explanatory speech is necessary to render the act of paying bail communicative, the act itself does not "comprehensively communicate its own message." *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017). It follows that The Bail Project's act of paying bail "is not so inherently expressive that it warrants protection" under the First Amendment. *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 66 (2006).

Because the act of paying bail is not inherently expressive conduct, HEA 1300 does not implicate the First Amendment, so The Bail Project's facial vagueness challenge fails. A vagueness challenge outside the First Amendment context must be brought as applied to specific conduct. Yet The Bail Project has not advanced an as-applied challenge.

And even if HEA 1300 triggered First Amendment scrutiny, it would survive analysis under *United States v. O'Brien*, 391 U.S. 367 (1968). HEA 1300 does not regulate The Bail Project's speech at all. It does not prohibit The Bail Project from advocating for the end of cash bail, forbid the organization from collecting data about the bail system, bar The Bail Project from advocating against cash bail on its website, or prevent the organization from engaging in other outspoken efforts to "disrupt" the bail system. Regulating who may spring a defendant from jail pending trial falls

18

squarely within the State's police power and furthers the substantial interests in protecting the public and ensuring a defendant's presence at trial. The Act is narrowly tailored because it restricts The Bail Project's ability to bail out only those defendants who pose the greatest flight risk and danger to the community. So even if the payment of bail were inherently expressive (it is not), HEA 1300 would pass muster under the *O'Brien* standard.

II. The Bail Project also cannot establish a likelihood of success on its challenge under the Equal Protection Clause. HEA 1300 prohibits only charitable bail organizations from paying cash bail for those charged with certain violent offenses or those with felony charges and violent criminal histories. But the General Assembly reasonably concluded that those defendants are at the greatest risk of flight or committing more violent crime while out on bail. The legislature also reasonably concluded that the incentives and relationships implicated when a friend or family member posts cash bail are absent when a national, multi-million-dollar advocacy organization posts bail, and so a defendant bailed out by a charitable bail organization will not have the same pressure to show up to trial or the same deterrent against committing further violent crime.

And unlike the bail-bond industry, charitable bail organizations like The Bail Project are subject to less regulation but have less responsibility, little accountability and transparency, and weaker incentives to ensure defendants appear for trial. HEA 1300 does not charge charitable bail organizations—such as The Bail Project—with the duty of apprehending absconded defendants or employing a recovery agent to do

19

so. Further, charitable bail organizations are not subject to late-surrender fees and do not stand to lose livelihood by standing as surety for the riskiest defendants; they stand to lose only crowdsourced (i.e., other people's) money. Given the differing responsibilities and restrictions, the State has a substantial interest in narrowing a charitable bail organization's ability to bail out those charged with more serious offenses with funds sourced from contributors unconnected to the local community or to the defendant.

## ARGUMENT

The Court should affirm the district court's denial of The Bail Project's motion for a preliminary injunction. Preliminary injunctive relief "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (cleaned up). To obtain a preliminary injunction, The Bail Project needed to "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court reviews a district court's grant of a preliminary injunction de novo as to its legal conclusions, for clear error as to its factual findings, and for abuse of discretion as to its balance of the equities. *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 269 (7th Cir. 2009).

The district court did not abuse its discretion in denying The Bail Project's motion for a preliminary injunction because it correctly determined that The Bail

Project cannot establish a likelihood of success on either its claims under the First Amendment or its claim under the Equal Protection Clause.

## I.    HEA 1300 Does Not Implicate, Let Alone Violate, the First Amendment Because the Payment of Bail Is Not Inherently Expressive Conduct

The First Amendment's free-speech protections extend beyond speech itself and encompass expressive conduct or "symbolic speech." *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 65 (2006). Not all conduct, however, qualifies for First Amendment protection as expressive conduct. Because "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989), the Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," *United States v. O'Brien*, 391 U.S. 367, 376 (1968). And when conduct falls outside the "expressive conduct" box, the First Amendment does not come into play at all. *See, e.g.*, *Rumsfeld*, 547 U.S. at 66; *Tagami v. City of Chicago*, 875 F.3d 375 (7th Cir. 2017).

The Bail Project's First Amendment challenge fails at the threshold because the payment of cash bail is not expressive conduct. It necessarily follows that HEA 1300 does not implicate the special vagueness concerns applicable in the free-speech context. And even if the payment of bail were expressive conduct, HEA 1300 satisfies *O'Brien*'s standard of intermediate scrutiny.

### A. Paying bail in the county clerk's office is not inherently expressive conduct protected by the First Amendment

The Bail Project's payment of cash bail is not inherently expressive conduct subject to protection under the First Amendment because The Bail Project's explanatory speech is essential to understanding the intended expressive element. The Bail Project is obligated to demonstrate that its conduct is expressive, *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984), and to carry that burden it must establish that its conduct is both (1) subjectively intended to communicate a message, *Texas v. Johnson*, 491 U.S. 397, 404 (1989), and (2) is objectively "inherently expressive," *Rumsfeld*, 547 U.S. at 65–66. The Bail Project cannot establish that the payment of bail is objectively *inherently* expressive.

1.     To qualify as inherently expressive conduct, the conduct itself must convey the message without the need for additional speech to explain the expressive significance of the act. A person or entity cannot "transform conduct into 'speech' simply by talking about it"; indeed, "that such explanatory speech is necessary is strong evidence that the conduct … is not so inherently expressive that it warrants protection under *O'Brien*." *Rumsfeld*, 547 U.S. at 66. It follows that to trigger First Amendment scrutiny, conduct "must comprehensively communicate its own message without additional speech." *Tagami*, 875 F.3d at 378. In other words, "the conduct itself must convey a message that can be readily 'understood by those who view[] it.'" *Id*. (quoting *Johnson*, 491 U.S. at 404). Were it otherwise, a person could trigger First Amendment scrutiny of the Tax Code, for example, by "announc[ing] that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes."

*Rumsfeld*, 547 U.S. at 66. Yet "[n]either *O'Brien* nor its progeny supports such a result." *Id.* And if conduct is not inherently expressive, it is not protected by the First Amendment, so the analysis ends there.

The Supreme Court has thus rejected pleas for First Amendment scrutiny when supplemental speech is necessary for an objective observer to understand that conduct is not merely conduct but an expressive message. In *Rumsfeld*, the Court held that barring military recruiters from on-campus interviews was not inherently expressive because an observer who saw military recruiters interviewing away from campus would not understand whether it was because the law school disapproved of the military, the law school's rooms were full, or the military wanted to interview elsewhere. 547 U.S. at 66. Because "[t]he expressive component of a law school's actions [was] not created by the conduct itself but by the speech that accompanie[d] it," the conduct was not inherently expressive and thus did not implicate the First Amendment. *Id.*

This Court has similarly rejected attempts to transform conduct into constitutionally protected expression using explanatory speech. In *Tagami*, for example, the Court held that the act of baring one's breasts in public was not inherently expressive because supplemental explanatory speech was necessary for an objective observer to understand that the person was communicating a message. 875 F.3d at 378. And in *Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*, the Court rejected the plaintiff's argument that his travel to Iraq was "inherently expressive" because a

person observing his travels "would have no way of knowing what message he intended to express unless [the plaintiff] explained it using speech." 559 F.3d 595, 605 (7th Cir. 2009); *see also, e.g.*, *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1337–38 (11th Cir. 2021) (building a new mansion is not expressive conduct); *cf. Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1244 (11th Cir. 2018) (explaining that "[t]he critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct" and concluding that the act of sharing food with homeless during weekly events in public parks was sufficiently expressive).

Indeed, although context is important in determining whether conduct is inherently expressive conduct, courts look only to the context in which the conduct arises, not to explanatory speech. So, for example, in *Spence v. Washington*, the Court held that stitching a peace symbol onto the American flag—itself a well-established and powerful symbol—after the Kent State tragedy and during the Vietnam War was inherently expressive conduct. 418 U.S. 405, 410 (1974). Similarly, in *Johnson*, the Court held that burning the "American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President" was inherently expressive and overtly political conduct. 491 U.S. at 406.

Context can also convey the symbolic and expressive nature of other sorts of conduct not involving flags. For instance, burning a draft card on the steps of a courthouse may be inherently expressive, *O'Brien*, 391 U.S. at 369, conducting a "sit in" as

a form of civil disobedience during the Jim Crow era may be inherently expressive, *Brown v. Louisiana*, 383 U.S. 131, 141–142 (1966), wearing symbolic clothing, when viewed in the context of world events, may constitute inherently expressive conduct, *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 505 (1969), homeless people sleeping in symbolic tent cities erected on public land may be inherently expressive, *Clark*, 468 U.S. at 293–94, and marching in a parade may constitute inherently expressive conduct, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 573 (1995) ("Parades are ... a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches."). But in all these cases the expressive nature of the conduct is inherent in the conduct when viewed in context—it is not dependent on speech explaining the actor's expressive intent.

2.     The Bail Project's payment of cash bail is not inherently expressive conduct. To pay bail, an employee of The Bail Project appears in-person at the county clerk's office and pays bail via cashier's check; in addition to handing over the check, the employee either completes a bond form containing basic identifying information or signs a ledger that stays in the clerk's office, depending on the county. R.28-1 at 2–3, 12–13. In fact, The Bail Project does not seek an audience for its nonspeech conduct at the clerk's office and takes steps to conceal the details of its bail payments. The organization declines to publicize the individuals it bails out—claiming the information is proprietary and confidential—and instead relies on statistics it says support its overall message. R.28-5 at 1, 4-5. The Bail Project's payment of bail thus is

observed only by the county clerk on the other end of the transaction and perhaps a citizen who happens to be in the clerk's office when payment is made. R.28-1 at 12–13 (describing the way The Bail Project pays bail).

Even if the audience includes the state court judges (who do not actually observe the payment), The Bail Project's act of paying bail is not *inherently* expressive. The Bail Project emphasizes that context and the target audience matter, and it insists that the judges (and maybe others involved in the bail system) would understand The Bail Project's payment of bail to express a message. But that is only because The Bail Project told them so. *See, e.g.*, R.28-5; R.28-9; R.28-10; R.28-11. Absent The Bail Project's speech about its position and beliefs and the speech it creates from the data generated by its acts of paying cash bail, no reasonable observer would understand the payment of cash bail to be anything other than a way to secure a defendant's pretrial release. Without speech accompanying the act of paying, a spectator would not know why the person was paying bail.

Because The Bail Project's act of paying bail embodies a communicative element only when supplemented with explanatory speech, the act is not inherently expressive conduct and thus is not protected by the First Amendment. Rather, this case is controlled by decisions like *Rumsfeld*, *Tagami*, and *Clancy*. Just as in those cases, The Bail Project's payment of cash bail does not "comprehensively communicate its own message without additional speech." *Tagami*, 875 F.3d at 378. The communicative nature of the act arises only by virtue of The Bail Project's other speech. And the need for that other speech confirms that the conduct is not inherently expressive and

thus not shielded by the First Amendment. *See Rumsfeld*, 547 U.S. at 66 ("The fact that such explanatory speech is necessary is strong evidence that the conduct … is not so inherently expressive that it warrants protection.").

Stripping away The Bail Project's explanatory speech, the act of paying bail itself is manifestly not inherently expressive conduct.[4] A person observing another paying bail in a county clerk's office would not understand that payment to be an expressive statement. Even if the observer is aware that some question the role of bail in the criminal-justice system, she would have no idea whether a person paying bail in the county clerk's office is expressing a message or simply engaging in a financial transaction to bail someone out of jail. Indeed, given the nature of bail—and the fact that the vast majority of people paying bail are not even subjectively engaging in expressive conduct—the idea that a reasonable observer would understand the act to be anything other than a financial transaction to secure a defendant's release is highly doubtful. The act occurs in a government office—a nonpublic forum—without fanfare. The relative obscurity thus significantly limits the potential audience, and that limited audience makes it highly improbable that a reasonable spectator would view The Bail Project's act of paying bail to be anything other than a simple financial transaction to secure one's release. People generally do not attempt to make grand political and socioeconomic statements in relative obscurity, and the reasonable observer knows this. *See Burns*, 999 F.3d at 1339 (explaining that "a viewer cannot infer

---

[4] Indeed, The Bail Project acknowledged below that bail agents "are not exercising their First Amendment Rights when they pay bail," R.26 at 16 n.7, which confirms that the act of paying bail itself is not inherently expressive.

a message from something the viewer cannot view"); *cf., e.g., Johnson*, 491 U.S. at 406 (flag burning at political rally); *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1244 (sharing food during homelessness event in public park).

Nor is there an overwhelmingly apparent communicative significance in the simple act of paying money to the government. There is nothing inherently expressive about the payment of money, whether it be to bail someone out of jail, buy groceries, purchase drugs, or make a mortgage payment. Paying bail simply does not carry any symbolic significance, and no reasonable observer would believe that paying cash bail is on the same plane of symbolic expression as, for example, burning a flag or draft card or marching in a parade.

The Bail Project's use of data it collects from its non-expressive conduct in paying bail to support its speech and its underlying motivation to pay bail to generate that data also does not make the act of payment inherently expressive. The organization claims that it pays bail to generate statistics so it may demonstrate that cash bail is not necessary in the criminal justice system. But the First Amendment does not confer a right of data collection. The Supreme Court has rejected the view that "a regulated party [can] … transform conduct into 'speech' simply by talking about it." *Rumsfeld*, 547 U.S. at 66. This Court likewise rejected a First Amendment challenge to a travel ban because the regulations prohibited action—travel—and not speech, even though the objecting citizen claimed he needed to travel to Iraq to gain information to speak out against government action. *Clancy*, 559 F.3d at 605. The Bail

Project's attempt to transform its data-generating action in the clerk's office into speech fares no better.

By requiring that conduct be inherently and comprehensively expressive to trigger First Amendment scrutiny, the Supreme Court has erected a high bar to avoid labeling "an apparently limitless variety of conduct" as "speech." *O'Brien*, 391 U.S. at 376. Yet under The Bail Project's view, any advocacy group could artificially create a First Amendment shield to its conduct—whatever conduct that may be—simply by setting the groundwork early on with speech that it is going to be engaging in conduct to send a message. That, however, would eviscerate the distinction between *inherently* expressive conduct and conduct that is expressive only because of supporting speech (before or after the conduct).

HEA 1300 thus does not implicate the First Amendment at all. The Act regulates only the payment of bail. It does not restrict what The Bail Project may say about bail. At most, the Act limits The Bail Project's ability to collect data for generating speech. But the payment of bail—the act that generates that data—is not inherently expressive and instead requires explanatory speech to convey a message.

## B. Because the payment of cash bail does not implicate the First Amendment, The Bail Project's facial vagueness challenge fails.

Because the transactional payment of cash bail is not expressive conduct, The Bail Project does not have a viable facial vagueness challenge to the certification provisions. Vagueness doctrine encompasses two distinct but related issues: (1) parties "should know what is required of them so they may act accordingly;" and (2) "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary

or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). When speech is involved, "rigorous adherence" to these requirements is "necessary to ensure that ambiguity does not chill protected speech," *id.* at 254, and so a litigant "subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license," *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56 (1988). But when the First Amendment is not implicated—i.e., when there is no expressive conduct—the statute should be reviewed as-applied to the plaintiff. *United States v. Naagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017).

The Bail Project's only argument relies on the erroneous premise that payment of cash bail is expressive conduct; it presents no alternative as-applied challenge. Appellant's Br. 30–33. But for the reasons set forth in Part I-A, because the payment of cash bail is not expressive conduct, The Bail Project's facial challenge fails and it must bring an as-applied challenge. *Naagelvoort*, 856 F.3d at 1130. Yet The Bail Project presents no argument advancing an as-applied challenge, Appellant's Br. 30–33, and it has not alleged that it has been denied certification or had such a certification suspended or revoked. The Bail Project has thus failed to show a likelihood of success on its vagueness challenge to the certification scheme.

## C. Even if the payment of bail implicated the First Amendment, HEA 1300 would be subject to and would survive intermediate scrutiny under *O'Brien*

The payment of bail is not inherently and comprehensively expressive, yet even if it were, HEA 1300 would not violate the First Amendment because it regulates the

conduct of paying bail as part of the State's criminal justice system and not any associated expression. The State generally "has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Johnson*, 491 U.S. at 406. And when speech and non-speech elements are combined, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment Freedoms." *Tagami*, 875 F.3d at 378 (quoting *O'Brien*, 391 U.S. at 376). This intermediate form of judicial scrutiny permits the regulation of expressive conduct when: (1) the law is within the government's general powers; (2) the law furthers an important or substantial governmental interest unrelated to the suppression of free expression; and (3) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377. In contrast, strict scrutiny applies only when the law is both content-based and directed at the suppression of speech. *Johnson*, 491 U.S. at 410–12.

Because the certification requirements target the conduct of paying bail, the standard applied to The Bail Project's claim is at most *O'Brien*'s intermediate scrutiny. No stricter standard is warranted because the certification requirements burden conduct and do no more than place an incidental burden on speech. 391 U.S. at 376–77. And, despite its protest that it has no burden, Appellant's Br. 38, The Bail Project is required to show a preliminary injunction is warranted. *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). Yet whether it pursues certification as a charitable bail organization or not, The Bail Project remains free to advocate against the cash bail

system and to lobby or advocate for change in Indiana. And, once certified, The Bail Project may continue to engage in a specific kind of conduct: paying cash bail for many but not all criminal defendants. HEA 1300 prohibits only a limited universe of conduct for certified charitable bail organizations—payment of bail for those charged with or who have a history of violent felonies—which applies to all charitable bail organizations irrespective of any advocacy or message advanced by the organization apart from that conduct.

Any incidental regulation of expressive conduct passes muster under the *O'Brien* factors. The State has broad police power and regulating the pretrial release component of its criminal justice system falls well within that power. Restrictions on payment of cash bail for certain felony defendants are unrelated to speech and narrowly tailored to advance the State's substantial interest in protecting the public and bringing to trial those charged with serious criminal offenses. HEA 1300 places limited sensible limitations on the operations of charitable bail organizations related to those facing charges for or with a history of violent felonies.

The State's adoption of HEA 1300 to advance its substantial interests is supported by sound reasoning. *See Tagami*, 875 F.3d at 379 (*O'Brien* does not require evidence of harms to uphold a challenged regulation). The State has a substantial interest in both protecting the public and bringing persons charged with felonies to trial. *See, e.g., United States v. Salerno*, 481 U.S. 739, 749 (1987) ("The government's interest in preventing crime by arrestees is both legitimate and compelling."). HEA 1300 ensures that a subset of those charged with serious felonies and those who have

a history of serious felonies, who have a higher chance of failing to appear for trial, are not bailed out by charitable bail organizations who, unlike licensed bail agents, are ill-equipped to ensure pre-trial appearances by tracking down and detaining a defendant who fails to appear.

Nor do charitable bail organizations maintain the same familial or friendship ties with a defendant that might otherwise provide a non-monetary incentive for a defendant to appear for trial. The Bail Project highlights the success of its program, Appellant's Br. 39–40, but of course, it has refused to disclose how it chooses those whom it selectively bails out, R.28-1 at 14, so its rates cannot be compared against the general population. And The Bail Project has also had notable failures. R.28-5 at 1; *see also* Courtney Crown, *Another Person Charged with Murder After Bail Project Pays Bail for Previous Charges*, Fox59.com (Oct. 21, 2021), https://fox59.com/news/indycrime/indianapolis-man-bailed-out-of-jail-by-bail-project-now-facing-murder-charges/; Nikki Sterling, *Op-Ed: The Bail Project Can Bail Out Anyone, Regardless of the Charge. That Should End.*, IndyStar (Jan. 5, 2022), https://www.indystar.com/story/opinion/2022/01/05/bail-project-needs-regulation-indiana-son-murder-out-bail/9087566002/. The General Assembly was entitled to reasonably respond to those failures.

HEA 1300 is narrowly tailored to advance the State's interest in protecting the public and securing defendants for trial. The Bail Project correctly notes that, in general, once a state trial court sets a bail amount it can be paid by anyone, even those without the means of physically apprehending a reluctant defendant, Appellant's Br.

39, but the General Assembly was entitled to act on and to prefer the common practice where that bail is typically paid by either a licensed bail agent or by someone with a pre-existing tie to the particular defendant. Each of those persons has incentives to ensure that a defendant appears for trial; either professionally or personally. And while charitable bail organizations may bail out up to three persons in any six-month span without any certification at all, Ind. Code § 27-10-2-4.5(g)(1), or seek certification and operate more broadly, Ind. Code § 27-10-2-4.5(g)(2), HEA 1300 only restricts charitable bail organizations from paying bail for those charged with certain violent felonies or who are facing felony charges with a history of violent felonies. *Id.* This is a limited and sensible restriction on charitable bail organizations to ensure that those who are posting bail for those defendants with a history of or facing charges for violent felonies have the means or relationship to aid in the production of the defendant for trial, advancing the State's substantial interest in the public safety and the works of its criminal justice system.

The State has a substantial interest in public safety and the operation of its criminal justice system. HEA 1300's limitation on the payment of bail by charitable bail organizations for certain classes of defendants who are accused of or have a history of violent felonies is a sensible and narrowly tailored regulation that advances the State's interests while placing no more than an incidental burden on The Bail Project's speech, so it does not have a reasonable likelihood of success on its claim under *O'Brien*.

34

## II.  HEA 1300 Does Not Violate the Equal Protection Clause Because the Legislature Reasonably Believed that Charitable Bail Organizations Lack the Incentives and Deterrent Effects Possessed by Family, Friends, and Bail Agents

The Bail Project's equal-protection challenge to HEA 1300 fares no better. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), but it does not strip States of all power of classification, *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 271 (1979). A classification that neither proceeds along suspect lines (such as race or gender) nor infringes fundamental rights is subject to rational-basis review, *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012), whereas a classification that singles out a "suspect class" or impinges upon the exercise of a fundamental right is subject to heightened judicial scrutiny, *Plyler v. Doe*, 457 U.S. 202, 216–18 & nn.14–16 (1982). Here, The Bail Project concedes that its claim is subject to only rational-basis review. Appellant's Br. 42–44; R.26 at 23.

A classification survives rational-basis review if it is rationally related to a legitimate governmental purpose. *Armour*, 566 U.S. at 680. The classification is presumptively valid, and the challengers bear the heavy burden "to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993). A statute does not violate the Equal Protection Clause if there is a plausible basis for the classification. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314–15 (1993). Importantly, the State need not attack an identified problem all at once but may instead "approach a perceived problem incrementally," *id.* at 316, even if the State

never addresses "the rest of the problem," *Brazil-Breashears v. Bilandic*, 53 F.3d 789, 793 (7th Cir. 1995); *see also Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955).

The Bail Project's equal-protection claim fails because the General Assembly has a rational basis for subjecting charitable bail organizations, like The Bail Project, to regulation and for preventing such organizations from bailing out violent offenders. On its face, HEA 1300 applies to all charitable bail organizations, which encompasses all organizations that pay cash bail for more than three people in a 180-day period. Ind. Code § 27-10-2-4.5(a)(1). And it forbids a charitable bail organization from paying cash bail for a criminal defendant who has been charged with a crime of violence or who is charged with a felony and has a prior conviction for a crime of violence. Ind. Code § 27-10-2.4.5(g)(2). The Bail Project contends that there is no rational basis for prohibiting only charitable bail organizations from bailing out certain offenders. The Bail Project is wrong.

The General Assembly could rationally believe that defendants charged with violent crimes or with felonies and a history of violent crime are more likely to jump bail and more likely to pose a danger to the community. Because the penalties for crimes of violence and felonies are usually stiffer, *see* Ind. Code §§ 35-50-1-2(a), 35-50-2-4, 35-50-2-4.5, 35-50-2-5, 35-50-2-5.5, 35-50-2-6, 35-50-2-7, the legislature could rationally believe that the risk of not showing up for trial is greater among that group of offenders. And it could also rationally believe that defendants with a violent past are more likely to pose a risk to the community if released on bail pending trial.

Owing to the increased risk of flight and violence posed by that category of defendants, the legislature could also rationally determine that the differences between charitable bail organizations and others justifies differential treatment. The Bail Project, as a national and multi-million-dollar organization created for the purpose of advocating for bail reform, cannot plausibly suggest that it is similarly situated to a criminal defendant's family and friends. If a defendant jumps bail, The Bail Project stands only to lose a pittance of its crowdsourced funds and can replenish those funds with more crowdsourcing. And if a bailed defendant commits further violent crime, The Bail Project suffers only a negative data point in its advocacy mission. Indeed, The Bail Project prides itself on the number of defendants it has bailed out (more than 22,000 nationwide) and is highly selective in the cases it publicizes, R.28-4 at 3; R.28-5 at 1, 4–5; R.28-10 at 5, so a single "failure" can be buried in a statistic even if it wreaks havoc on the lives of those in the community.

Unlike the remote relationship between a charitable bail organization and a defendant, the relationship between a criminal defendant and his family and friends creates incentives to ensure the defendant's presence at trial and to deter the defendant from committing more crimes. A family or friend who bails out a violent defendant must make a risk calculus that is unlikely to sway a large organization flush with crowdsourced funds. If a defendant jumps bail, the family or friend suffers by forfeiting the bail amount—which may be a considerable dent on an individual's finances—so that person has an incentive to ensure the defendant's presence at trial. Relatives and friends also have nonfinancial incentives stemming from the bonds of family and

friendship (e.g., the desire to encourage a loved one to "do the right thing"). Similarly, those close to a defendant are also apt to consider the risks to their own safety and the safety of others in the community when determining whether to post cash bail. And from the bailed-out criminal defendant's perspective, the pressures of being bailed out by a relative or friend are apt to sway the defendant's thought process. The legislature could rationally believe that a defendant is more likely to consider the financial, physical, emotional, and reputational consequences to friends and family to be a deterrent to jumping bail or committing more crime when compared with the paltry financial consequence to a charitable bail organization.

Charitable bail organizations are likewise different from the already-regulated actors in the bail industry, who are subject to greater oversight. Bail agents and sureties are permitted to post bail for a criminal defendant charged with a crime of violence or someone charged with a felony with a prior conviction of a crime of violence. But someone must pay the premium to the bail agent, and the legislature could reasonably believe that the person paying the premium is often going to be a relative or a friend, so the incentives that exist when family or friends post cash bail are similarly present when they secure the services of a bail agent. And the highly regulated bail-bond industry has additional incentives. For example, unlike charitable bail organizations, the traditional bail-bond industry bears responsibility for apprehending and surrendering a defendant to the court—by employing a licensed recovery agent— if the defendant fails to appear, which occurs on average at a higher rate with higher risk offenders. And if the bail agent or surety fails to do so within 120 days, they incur

late-surrender fees, which escalate for 365 days absent the defendant's return to answer for his charged crime. Ind. Code § 27-10-2-12. Bail agents and recovery agents are also licensed professionals subject to continuing-education requirements and risk losing their livelihoods if they fail to abide by the regulations of the profession. Ind. Code §§ 27-10-3-2, 27-10-3-7, 27-10-3-8, 27-10-3-9, 27-10-3-10.

Nor is it constitutionally significant that other charitable entities are not subject to the same restrictions as charitable bail organizations. Indeed, HEA 1300 excludes from the definition of "charitable bail organization" an entity that bails out three or fewer defendants every 180 days. Ind. Code § 27-10-2-4.5(a)(1). But the legislature was not responding to isolated instances of charity, and The Bail Project has not provided evidence that other charitable entities post cash bail in the same manner and with the same frequency as charitable bail organizations. In any event, the legislature does not violate the Constitution by addressing a problem in piecemeal fashion, for "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970); *see also Williamson*, 348 U.S. at 489 ("Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." (internal citations omitted)).

In enacting HEA 1300, the General Assembly sought to give the Department of Insurance regulatory oversight over charitable bail organizations, which have become more active in Indiana in recent years. R.28-1 at 2, 10–12; R.28-4 at 4–6. And it was reacting to several well-publicized instances in which criminal defendants with violent tendencies had been bailed out by The Bail Project, only to commit further crimes. While the legislature could have extended its prohibition on paying cash bail for certain defendants to others, it reasonably concluded that the drastically different relationships, incentives, and deterrents that exist when friends or family pay cash bail—or secure the services of a bail agent—justify limiting the prohibition to charitable bail organizations. The district court thus correctly concluded that The Bail Project failed to establish a likelihood of success on the merits of its equal-protection challenge.

## CONCLUSION

The Court should affirm the district court's order denying The Bail Project's request for a preliminary injunction.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Telephone: (317) 232-4774
Fax: (317) 232-7979
Aaron.Craft@atg.in.gov

Dated: September 14, 2022

AARON T. CRAFT
Section Chief, Civil Appeals

*Counsel for Defendant-Appellee*

## FED. R. APP. P. 32(g) WORD COUNT CERTIFICATE

1.      Pursuant to Fed. R. App. P. 32(g), the undersigned counsel for the appellees certifies that this brief complies with the type-volume limitations of Circuit Rule 32(c) because the brief contains 10,906 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook typeface, font size 12 for the text and font size 11 for the footnotes. *See* Cir. R. 32(b).

Aaron T. Craft
Section Chief, Civil Appeals
